**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN W. DUVALL,

      Petitioner - Appellant,

v.

DAN REYNOLDS,

      Respondent - Appellee.

No. 96-6329

ORDER

Filed March 4, 1998

Before **TACHA**, **BALDOCK**, and **KELLY**, Circuit Judges.

The petition for rehearing by the panel is granted. The original opinion is withdrawn. This opinion is ordered substituted for the original opinion filed in this case.

No member of the active court called for a poll, the en banc suggestion is denied.

ENTERED FOR THE COURT

PATRICK FISHER
Clerk of Court

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 4 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN W. DUVALL,

        Petitioner - Appellant,

v.

DAN REYNOLDS,

        Respondent - Appellee.

No. 96-6329
No. 97-6299

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. CIV-94-404-M)**

Don J. Gutteridge, Jr., Oklahoma City, Oklahoma, appearing for Petitioner-Appellant.

William L. Humes, Assistant Attorney General (W.A. Drew Edmondson, Attorney General of Oklahoma and Sandra D. Howard, Assistant Attorney General, with him on the brief), Oklahoma City, Oklahoma, appearing for Respondent-Appellee.

Before **TACHA**, **BALDOCK**, and **KELLY**, Circuit Judges.

**TACHA**, Circuit Judge.

    John Wayne Duvall, an Oklahoma state prisoner sentenced to death, appeals

the district court's denial of his petition for a writ of habeas corpus under 28

U.S.C. § 2254.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291.  For the reasons set forth below, we affirm.

**BACKGROUND**

In August 1985, Mr. Duvall, his common-law wife Karla, and their son Marcus, moved into a duplex in Duncan, Oklahoma.  Several months later, due to marital difficulties, Mr. Duvall moved out.

On Thursday, September 18, 1986, Mr. Duvall went to the Stephens County Courthouse.  He asked to speak with Alvie Chasteen, a county commissioner and former assistant police chief.  At Mr. Duvall's request, Mr. Chasteen accompanied him to an office in the Sheriff's Department.  Mr. Chasteen asked whether Mr. Duvall was in trouble.  Mr. Duvall responded, "I killed my wife Monday night."

Mr. Chasteen immediately contacted Sheriff Bill Alexander, who read Mr. Duvall his Miranda rights.  Mr. Duvall executed a waiver form and stated that he desired to talk to the authorities.

According to Mr. Duvall's confession, he received a call from his wife, Karla, on Monday afternoon.  He stated that she was angry with him because he arranged for her drug prescription to be canceled.  She managed, however, to

secure a supply of the drug in spite of Duvall's efforts to prevent her from obtaining drugs.

Mr. Duvall explained that he went to a local bar that evening. At about 9:00 pm, an acquaintance gave him a ride to the duplex where his wife lived. He waited on the porch of an empty duplex next door. At about 10:30 pm, he knocked on his wife's door. Karla answered the door and inquired about their son. He replied that their son was at his grandmother's home. Mr. Duvall then grabbed Karla by the throat, forced his way into the apartment, and threw her on the floor. After Mr. Duvall dragged Karla into the kitchen, he took some knives from a drawer and stabbed her multiple times. At Karla's request, Mr. Duvall helped her to the shower, washed her off, and laid her on the bed. Karla pleaded for Duvall's help. Mr. Duvall replied, "[I]t's just too late for that." State's Ex. 24 (transcript of police interview). He then placed a pillow over Karla's head and suffocated her.

On September 19, 1986, the State of Oklahoma charged Mr. Duvall with murder in the first degree. On November 17, 1986, the State filed a Bill of Particulars seeking the death penalty based on two aggravating circumstances: (1) that Mr. Duvall was previously convicted of a felony involving the use or threat of violence to the person and (2) that the murder was especially heinous, atrocious, or cruel.

During the guilt phase of the trial, a jury convicted Mr. Duvall of one count of murder in the first degree. During the penalty phase of the trial, the jury found that both of the above statutory aggravating circumstances existed and recommended that Mr. Duvall be sentenced to death. On May 20, 1987, the trial judge sentenced Mr. Duvall to death in accordance with the jury's recommendation. On May 28, 1991, the Court of Criminal Appeals of Oklahoma affirmed Mr. Duvall's conviction. Duvall v. State, 825 P.2d 621 (Okla. Crim. App. 1991). On October 5, 1992, the United States Supreme Court denied certiorari. Duvall v. Oklahoma, 506 U.S. 878 (1992).

On December 4, 1992, Mr. Duvall filed an "Application for Post-Conviction Relief" in the district court of Stephens County. The district court denied the application on June 8, 1993. Duvall v. State, No. CRF-86-251 (Okla. Dist. Ct. 1993). On June 17, 1993, Mr. Duvall filed a "Notice of Intent to Appeal" the denial of post-conviction relief. On February 10, 1994, the Court of Criminal Appeals of Oklahoma dismissed the appeal for lack of jurisdiction because Mr. Duvall failed to file a Petition in Error and a copy of the district court's order. Duvall v. State, 869 P.2d 332, 334 (Okla. Crim. App. 1994). The Court of Criminal Appeals ordered that Mr. Duvall be executed on April 8, 1994. Id. On March 28, 1994, the Court of Criminal Appeals denied Mr. Duvall's

motion for reconsideration. Duvall v. State, 871 P.2d 1386 (Okla. Crim. App. 1994).

On March 23, 1994, Mr. Duvall filed an "Application to Stay Execution" in the United States District Court of the Western District of Oklahoma. The district court determined that it lacked jurisdiction to grant a stay and dismissed the petition because Mr. Duvall did not file a habeas petition with his motion. Duvall v. Reynolds, No. 94-CV-404-R (W.D. Okla. Mar. 24, 1994). On April 4, 1994, we granted the stay and remanded the case to the district court for further proceedings. Duvall v. Reynolds, No. 94-6106 (10th Cir. Apr. 4, 1994).

On November 14, 1994, Mr. Duvall filed a petition for a writ of habeas corpus with the United States District Court for the Western District of Oklahoma. In his petition Mr. Duvall raised fourteen grounds of error, including ineffective assistance of counsel during both the guilt and penalty phases of his trial. On November 27, 1995, at Mr. Duvall's request, the district court conducted an evidentiary hearing to consider whether Mr. Duvall received ineffective assistance of counsel during the penalty phase of his trial. On July 10, 1996, the district court rejected Mr. Duvall's habeas claim of ineffective assistance of counsel during the penalty phase of his trial. On August 22, 1996, the district court concluded that Mr. Duvall was not entitled to relief on his

remaining claims and dismissed his petition. The district court granted Mr. Duvall's motion for a certificate of appealability on September 26, 1996.

On appeal from the denial of his habeas petition, Mr. Duvall asserts that: (1) he received ineffective assistance of counsel at trial because his attorney failed to present any mitigating evidence during the penalty phase,[1] (2) the State failed to disclose exculpatory evidence, (3) the trial court failed to instruct the jury on the lesser included offenses of murder in the second degree and manslaughter in the first degree, (4) the trial court erred in admitting Mr. Duvall's prior bad acts, (5) the trial court prevented Mr. Duvall from introducing evidence of the decedent's prior drug conviction in support of his defense, (6) the trial court failed to instruct the jurors that they could impose a life sentence even if they found an aggravating circumstance, (7) the jury instructions confused the jury regarding its responsibility to weigh mitigating circumstances, (8) the jury instruction concerning the aggravating circumstance "especially heinous, atrocious, or cruel" was unconstitutionally vague, (9) the prosecutor made improper statements during closing arguments, and (10) the State failed to give Mr. Duvall adequate notice of the witnesses and evidence that the State intended to use during the penalty phase of the trial.

---

[1] Mr. Duvall does not appeal the district court's determination that he did not receive ineffective assistance of counsel during the guilt phase of his trial.

## DISCUSSION

Before we address the merits of Mr. Duvall's claims, we must first address the applicability of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, to this case. Title I of the AEDPA, entitled "Habeas Corpus Reform," altered the law governing habeas corpus petitions in two ways. First, the AEDPA made a number of procedural and substantive changes to the habeas corpus provisions in Chapter 153 of Title 28 of the United States Code. AEDPA §§ 101-106 (codified at 28 U.S.C. §§ 2244, 2253-55). Second, the AEDPA created chapter 154, which establishes special habeas corpus procedures that supplement the provisions of Chapter 153 in capital cases. AEDPA § 107 (codified at 28 U.S.C. §§ 2261-66).

In Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997), the Supreme Court held that the amended provisions of Chapter 153 apply only to habeas cases filed after the AEDPA became effective on April 24, 1996. In contrast to the amendments to Chapter 153, Congress provided that Chapter 154's new habeas procedures for capital cases "shall apply to cases pending on or after the date of enactment of this Act." AEDPA § 107(c); Lindh, 117 S. Ct. at 2063 (quoting § 107(c)). Mr. Duvall's habeas claim falls within this time frame. Chapter 154's special procedures, however, are available only to states that qualify by ensuring that

- 7 -

indigent capital defendants receive competent legal representation. See 28 U.S.C. § 2261(a)-(c).

In this appeal, Oklahoma does not argue that it is a qualifying state for purposes of the AEDPA's new capital habeas corpus procedures. Equally important, in a recent case Oklahoma conceded that it is not a qualifying state for purposes of the new capital habeas corpus provisions. Williamson v. Ward, 110 F.3d 1508, 1513 n.5 (10th Cir. 1997). In light of Lindh and Oklahoma's concessions, we review the denial of Mr. Duvall's habeas petition under pre-AEDPA law.

## I.    INEFFECTIVE ASSISTANCE OF COUNSEL

In his first claim, Mr. Duvall asserts that his Sixth Amendment rights were violated because he received ineffective assistance of counsel. In particular, Mr. Duvall argues that his trial counsel, Robert Prince, failed to investigate, prepare, or present any mitigating evidence during the penalty phase of the trial in violation of his Sixth Amendment rights. "A claim of ineffective assistance of counsel presents a mixed question of law and fact which we review de novo." Brewer v. Reynolds, 51 F.3d 1519, 1523 (10th Cir. 1995).

To prevail on his ineffective assistance of counsel claim, Mr. Duvall must first show that his counsel "committed serious errors in light of 'prevailing

professional norms'" such that his legal representation fell below an objective standard of reasonableness. United States v. Haddock, 12 F.3d 950, 955 (10th Cir. 1993) (quoting Strickland v. Washington, 466 U.S. 668, 688 (1984)). The petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance [that] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). He must, in other words, overcome a presumption that his counsel's conduct was constitutionally effective. See Haddock, 12 F.3d at 955. A claim of ineffective assistance "must be reviewed from the perspective of counsel at the time," Porter v. Singletary, 14 F.3d 554, 558 (11th Cir. 1994), and therefore may not be predicated on "the distorting effects of hindsight." Strickland, 466 U.S. at 689. We consider "not what is prudent or appropriate, but only what is constitutionally compelled." United States v. Cronic, 466 U.S. 648, 665 n.38 (1984). Moreover, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the [accused's] own statements or actions." Strickland, 466 U.S. at 691.

If Mr. Duvall is able to show constitutionally deficient performance, he must then demonstrate that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." Haddock, 12 F.3d at 955 (quoting Strickland, 466 U.S. at 694). Thus, where the alleged ineffective

assistance occurred during the penalty phase of a capital trial, we consider whether there is a "reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland, 466 U.S. at 695.

## A. The Duty to Investigate, Prepare, and Present Potential Mitigating Evidence

The duty to investigate derives from an attorney's basic function, which is "to make the adversarial testing process work in the particular case." Strickland, 466 U.S. at 690. "Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, [the Supreme Court has] noted that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (quoting Strickland, 466 U.S. at 691).

"In a capital case the attorney's duty to investigate all possible lines of defense is strictly observed." Coleman v. Brown, 802 F.2d 1227, 1233 (10th Cir. 1986); see also Stafford v. Staffle, 34 F.3d 157, 1563-64 (10th Cir. 1994) (finding that counsel's failure to conduct any investigation for possible mitigating evidence was unreasonable); Osborn v. Shillinger, 861 F.2d 612, 626-31 (10th

- 10 -

Cir.1988) (finding that counsel's lack of investigation and preparation was unreasonable). An attorney's duty to investigate, however, is not unlimited. As we explained in <u>Brecheen v. Reynolds</u>, 41 F.3d 1343 (10th Cir. 1994):

> In stating that an attorney has an affirmative duty to conduct an investigation into the existence of potential mitigating evidence, we do not imply that this duty is boundless. To the contrary, an attorney is not required to investigate all leads as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances.

<u>Id.</u> at 1366 (citations and internal quotation marks omitted).

In <u>Brecheen</u>, we also addressed an attorney's duty to present mitigating evidence. We stated:

> We agree . . . that counsel has no absolute duty to present mitigating character evidence at all. From this, it follows <u>a fortiori</u> that the failure to present available mitigating evidence is not <u>per se</u> ineffective assistance of counsel.
>
> If counsel has mitigating evidence available but elects not to present that evidence, then the inquiry must focus on the reason or reasons for the decision not to introduce that evidence. If counsel had a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty, then that decision must be given a strong presumption of correctness and the inquiry is generally at an end. If, however, the decision is not tactical, and counsel's performance is therefore deficient, then the first prong of <u>Strickland</u> is satisfied.

<u>Id.</u> at 1368 (citations and internal quotation marks omitted). The duty to present mitigating evidence, of course, is not independent of the duty to investigate and prepare. As we emphasized in <u>Brecheen</u>:

- 11 -

> [T]he relevant inquiry is whether trial counsel's decision was an informed tactical decision that was reasonable under the circumstances of the case. Having delineated the appropriate legal framework, it is important to note that the mere incantation of "strategy" does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been <u>reasonable</u> under the circumstances.

Id. at 1369 (citations and internal quotation marks omitted) (emphasis in original). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91. With these standards in mind, we now turn to whether Mr. Prince's decision not to present any mitigating witnesses constituted a reasonable tactical choice based on reasonable investigative efforts.

**B.      Investigation, Preparation, and Presentation of Mitigating Evidence During the Penalty Phase of the Trial**

At the evidentiary hearing, Mr. Prince testified about his investigation and preparation for Mr. Duvall's trial. Mr. Prince stated that he had spoken to all of the police officers and detectives in the case, as well as Jim Minter, a jailer. Mr. Prince also contacted Russell Bill and Tony Link, attorneys who had previously represented Mr. Duvall. He interviewed Hazel Branch and Gene Christian about collateral matters involving Karla, such as a protective order she obtained against Mr. Duvall. Mr. Prince spoke with a number of doctors about Mr. Duvall's

competency and mental condition at the time of the murder. Three psychological examinations were performed on Mr. Duvall, one at the direction of Mr. Prince. Mr. Prince acknowledged that he did not "really talk to any of the family members to that great an extent." He testified, however, that he did speak with Mr. Duvall's mother (Pearl Duvall), his brother (Jerry Duvall), and his brother-in-law (Eric Gorbid). More importantly, Mr. Prince stated that in preparing for the trial, he spent "several hundred hours" talking to Mr. Duvall. Evid. Hear. at 82.

At the evidentiary hearing, Mr. Prince also testified about his trial strategy and how it changed as the trial unfolded. Based on his investigation, Mr. Prince had concluded that Mr. Duvall should take the stand during both the guilt and penalty stages of the trial. Mr. Prince acknowledged that Mr. Duvall had "flip-flopped" several times in deciding whether to testify. Id. at 94. Nevertheless, Mr. Prince emphasized that when the trial started, Mr. Duvall had decided that he would testify. Thus, Mr. Prince voir dired prospective jurors about Mr. Duvall testifying. Mr. Prince also was prepared to present mitigating witnesses:

> I had Dr. Mynatt and Virginia Hoover on subpoena. I had Dr. Bonner on stand-by. I had his mother. As I recall, the brother -- and I don't remember if the brother-in-law had started backing up on me at that point or not. I had some witnesses that could have testified about some of these good things . . . .

Id. at 79. Although Mr. Prince was prepared to present these witnesses, he planned to call them only if Mr. Duvall first testified. Mr. Prince stated that he

- 13 -

had expected Mr. Duvall to testify and had planned to use the witnesses to bolster Mr. Duvall's testimony. Id. at 81. Three days into the trial, Mr. Duvall decided not to testify and expressed that he did not want anyone else to testify, forcing Mr. Prince to change his trial strategy. Id. at 78-79.

Once Mr. Duvall refused to testify during either phase of the trial, the trial judge, at Mr. Prince's request, conducted an in camera hearing concerning Mr. Duvall's decision and its impact on Mr. Prince's defense strategy. The following exchange transpired between Mr. Prince and Mr. Duvall at that hearing, which occurred before the penalty phase:

Q:    Previously, we had made a Record concerning whether or not you should testify in the first stage of the proceedings?
A:    True.
Q:    You and I have discussed this matter concerning the second stage as well, have we not?
A:    True.
Q:    And I had advised you that if you did take the stand [i]n the second stage that there are certain matters that you are aware of that the District Attorney would be able to cross examine you concerning, as well as perhaps bringing in additional evidence and additional witnesses. Is that correct?
A:    True.
Q:    And you and I discussed the pros and cons, pluses and minuses of your testimony, and you decided you did not wish to testify in the second stage?
A:    Right.
Q:    You understand that by not testifying in the second stage that we also had some other witnesses that could have come in and testified concerning your--your mental condition, in the sense of your suicidal efforts at the time of this transaction, as well as your examination by Dr. Mynatt and Dr. Bonner, but that by you not

- 14 -

testifying in the second stage, we did not feel it would be beneficial to bring any other witnesses to testify in the second stage either?

A: (John Duvall moved his head up and down.)

Q: Have you done that knowingly and intelligently, waiving your right to take the stand in the second stage?

A: Yes, sir.

Q: And you do agree that you did not want these other witnesses called as well?

A: Yes, I did.

Q: So the Record is silent as far as any defense to this second stage, but that is done with your consent, your full knowledge--

A: Yes.

Q: --and you believe that it was done in your best interest?

A: Yes.

Q: No one forced or threatened you to do that, did they?

A: No.

Q: You did it based on our evaluation of the evidence from the prosecution standpoint, as well as from a defense standpoint?

A: Right.

Q: Do you have any complaints about the way we conducted this trial?

A: No.

Tr. at 761-72.

Following the in camera hearing, the trial judge read the penalty phase instructions to the jury. Instruction No. 8 provided:

> Evidence has been offered as to the following mitigating circumstances:
> 1. Defendant surrendered himself;
> 2. Defendant informed the Sheriff of the killing and its details;
> 3. No law enforcement agency had previous knowledge of the death of Karla Duvall;
> 4. Defendant exhibited remorse;
> 5. Defendant cooperated with law enforcement authorities;

- 15 -

6. Defendant was under the influence of alcohol or drugs at the time of the incident;

7. The Defendant did not attempt to flee the jurisdiction of the State.

Whether these circumstances existed, and whether these circumstances are mitigating, must be decided by you.

R. at 176.

After the trial judge read the jury instructions, the parties made their closing statements. During his argument, Mr. Prince commented on the mitigating circumstances identified in Instruction No. 8, attempting to persuade the jury to spare Mr. Duvall from the death penalty. Nevertheless, the jury found the existence of both aggravating circumstances and recommended that Mr. Duvall receive the death penalty.

Despite Mr. Duvall's request that Mr. Prince forego the introduction of mitigating evidence at trial, he now complains that Mr. Prince should have introduced such evidence. In particular, Mr. Duvall contends that his attorney should have introduced evidence of: (1) Mr. Duvall's family history, (2) Mr. Duvall's alcohol abuse, (3) Mr. Duvall's recent church activity, (4) Mr. Duvall's remorse, and (5) the victim's drug abuse. In reviewing Mr. Duvall's contentions, we note that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the [accused's] own statements or actions," Strickland, 466 U.S. at 691, but the ultimate decision to introduce mitigating

- 16 -

evidence (other than the defendant's own testimony) is vested in the defendant's trial counsel, see Brecheen, 41 F.3d at 1368-69.

### 1. Duvall's Family History

Mr. Duvall first asserts that Mr. Prince should have conducted more extensive interviews with his family members and called several of them to testify about the mitigating aspects of Mr. Duvall's history. The evidentiary hearing in the court below revealed much about Mr. Duvall's difficult upbringing and troubled history.

The evidentiary hearing indicated that Mr. Duvall was born on May 21, 1951, into a very poor family. The youngest of twelve children, he grew up in a three-bedroom house in the small town of Duncan, Oklahoma. His father died when Duvall was ten years old. His mother provided the sole support for the family.

By the time he reached his early teens, Mr. Duvall had developed a problem with alcohol and drugs. Although Mr. Duvall maintained a good disposition when he was sober, he often became violent when he consumed alcohol or drugs.

Mr. Duvall dropped out of school after the ninth grade and eventually left home when he was sixteen or seventeen. He worked primarily as a laborer in oil refineries and as a pipe fitter. His alcohol problem and associated behavioral problems continued.

Following two failed marriages and another long-term relationship, Mr. Duvall became involved with Karla in 1981. When he met Karla, she was using narcotic pain killers. The couple soon began using drugs together. Although their drug use diminished during Karla's pregnancy, the couple resumed heavy use of narcotic pain killers following the birth of their son in the summer of 1982.

In 1985, Mr. Duvall began working part time for Joe Howard at Joe's Electric. Due to the encouragement of Joe Howard and his wife Wanda, Mr. Duvall began attending church. According to Wanda Howard, Mr. Duvall was trying to overcome his substance abuse problem to create a more stable family environment for his son. Family members and friends indicated that Mr. Duvall wanted Karla to stop using drugs as well.

A month or two before she was murdered, Karla obtained a restraining order against Mr. Duvall. Days before her death, Joe Howard overheard Mr. Duvall making calls to local doctors asking them to stop giving Karla drugs. According to Mr. Duvall, on September 15th, the day of Karla's death, Karla phoned Duvall at work and informed him that she had resumed taking drugs.

In conjunction with his continual substance abuse, Mr. Duvall had many encounters with the local law enforcement. Some of these encounters resulted in convictions for violent felonies. For example, in August 1969, Mr. Duvall pled guilty to a charge of assault with a dangerous weapon when he threatened two

men with a shotgun. In May 1976, Mr. Duvall was convicted of another charge of assault and battery with a dangerous weapon. In July 1984, Mr. Duvall was convicted on two counts of assault with a dangerous weapon after he threatened to kill Karla and two other women with a knife in a convenience store.

During the evidentiary hearing, Mr. Prince admitted that he could have called mitigating witnesses during the penalty phase of the trial. He explained, however, that "for everything someone would say good about [Duvall] they would have to say other things that were so negative that it got to the point where we were afraid that the negative outweighed the positive." Evid. Hear. at 78. Thus, Mr. Prince feared that the testimony of the defense's own potential witnesses would result in the introduction of evidence on cross-examination such that the overall effect of these witnesses would be more aggravating than mitigating. In addition, he was concerned that the prosecution would call members of Karla's family to rebut and contradict much of the mitigating testimony that he was able to elicit from others.

We hold that Mr. Prince's decision not to present mitigating evidence involving Duvall's family history was a reasonable one based on a constitutionally sufficient investigation. Mr. Prince was aware of most of Mr. Duvall's history prior to the trial, and the record gives us no reason to believe that Prince's investigation of Duvall's family history was inadequate. Based on his

conversations with Mr. Duvall and his family members, Mr. Prince concluded that his client's interests would not be served by introducing testimony concerning Mr. Duvall's family history.

Mr. Prince's reluctance to present the above evidence was justifiable. Although grievous, Mr. Duvall's life history does not automatically mitigate the aggravating circumstances that the jury found present here. As the Supreme Court has stated regarding evidence of a defendant's life history:

> On one hand, a jury could react with sympathy over the tragic childhood [the defendant] endured. On the other hand, since [the defendant's] sanity was not in issue in this case, the prosecution could use this same testimony, after pointing out that petitioner was nevertheless responsible for his acts, to emphasize that it was this same unpredictable propensity for violence which played a prominent role in the death of [the defendant's] victim. Mitigation, after all, may be in the eye of the beholder.

Burger v. Kemp, 483 U.S. 776, 794 (1987) (citations, alterations, and internal quotation marks omitted). See also Davis v. Executive Dir. of Dep't of Corrections, 100 F.3d 750, 762 (10th Cir. 1996) ("[W]e agree with the district court that a decision to present mitigation testimony from family members was fraught with peril, because [the defendant's] background contained numerous instances of conduct that [were] more likely to make a jury feel unsympathetic towards him, than sympathetic towards him."), cert. denied, 117 S. Ct. 1703 (1997); Brewer v. Reynolds, 51 F.3d 1519, 1527 (10th Cir. 1995) (finding that evidence of a defendant's turbulent and violent upbringing could justify either the

inference that the defendant was an unfortunate victim of his environment or that the defendant's crime was the culmination of defendant's own voluntary violent behavior and irresponsibility). For example, although the State introduced evidence that Mr. Duvall had been convicted of assault with a deadly weapon three times, the jury was unaware of the factual circumstances underlying these convictions. The jury also was unaware of Mr. Duvall's uncharged violent conduct. Once Mr. Duvall declined to testify during the penalty phase, Mr. Duvall's family members were the primary remaining source of evidence concerning Duvall's family history. Mr. Prince knew that each of Mr. Duvall's family members were aware of his prior convictions and violent tendencies.[2] Testimony on cross-examination concerning the factual circumstances of Mr. Duvall's prior violent conduct "could have been devastating." Brewer, 51 F.3d at 1527. This observation is particularly true regarding Duvall's prior assaults of Karla.

Moreover, Mr. Prince was rightly concerned that the district attorney might call members of Karla's family as rebuttal witnesses to testify about the violent past between Mr. Duvall and Karla. In short, the testimony of Mr. Duvall's

---

[2] The record indicates that Pearl Duvall did not know about much of Mr. Duvall's violent history. Mr. Prince explained that "because of his mother's age, he wasn't sure whether she remembered very much about the previous episodes and that he felt like the family had probably tried to keep some of that from her." Evid. Hear. at 98, 14-15.

family members would have presented the jury with information about his troubled background that could have also adversely affected the jury by introducing damaging facts not otherwise disclosed at trial. Thus, we hold that Mr. Prince's decision to forego evidence of Mr. Duvall's family history was a reasonable tactical decision based upon a constitutionally adequate investigation.

### 2. Substance Abuse

Mr. Duvall next argues that Mr. Prince should have introduced evidence of Mr. Duvall's alcohol abuse. According to Mr. Duvall, the jury would have considered evidence of his troubled history with alcohol and the fact that he was drinking on the day of the murder as compelling mitigating evidence. The evidentiary hearing testimony of Jerry Duvall, Mr. Duvall's brother, is indicative of the available evidence concerning Mr. Duvall's substance abuse:

> Well, when Johnny was -- when he wasn't on anything, I mean he was real jovial; everybody liked him and he got along great with everybody. But when he got on alcohol and drugs, I mean it was -- I mean it was a hundred percent turnaround. He could be sarcastic, belligerent. It didn't make any difference, I don't care if you were ten-foot tall and if you said anything to him and it just happened to hit him wrong, he was liable to hit you.

Evid. Hear. at 24. Whatever the mitigating effect of such testimony might have been standing alone, Mr. Prince's decision not to introduce such testimony was reasonable in light of two complicating factors. First, even though Mr. Duvall contended that he had been drinking on the day of the murder, see Evid. Hear. at

- 22 -

88, there was evidence that Mr. Duvall's decision to murder his wife had nothing to do with his consumption of alcohol. As Mr. Prince explained:

> [S]everal of the witnesses, the two guys that took him over to the house, one said he didn't even have an odor of alcohol; the other said, Well, he had a couple of beers but he certainly wasn't out of control. He was very calm, deliberate, very normal. They had known him.

Evid. Hear. at 83-84.

Second, Mr. Prince faced the same strategic dilemma as he did with the evidence of Mr. Duvall's family history. Testimony concerning Mr. Duvall's substance abuse would have resulted in the introduction of details of Mr. Duvall's prior convictions and violent conduct, which invariably resulted from his substance abuse. The jury could have perceived such evidence as aggravating rather than mitigating. See Davis, 100 F.3d at 763 ("We agree that it is just as likely the jury would react negatively to [the defendant's] repeated failures to effectively address his alcoholism."); Jones v. Page, 76 F.3d 831, 846 (7th Cir.) (noting that failure to introduce evidence of the defendant's long history of substance abuse "was a reasonable tactical choice because such evidence was a 'double-edged sword,' that is, it could easily have been considered either aggravating or mitigating evidence"), cert. denied, 117 S. Ct. 363 (1996). Under these circumstances, we hold that Mr. Prince reasonably decided not to introduce evidence of Mr. Duvall's substance abuse.

- 23 -

### 3. Church Activity

Mr. Duvall asserts that Mr. Prince should have presented evidence of his recent church attendance and his relationship with Wanda and Joe Howard. At the evidentiary hearing, the Howards testified that Mr. Duvall had begun attending church on a regular basis in the two months preceding the murder. Mr. Prince testified that Mr. Duvall contended that he was trying to turn his life around and that Mr. Duvall and his son had attended church within the couple of weeks preceding the murder, but Mr. Prince admitted that he did not interview Joe or Wanda Howard regarding Mr. Duvall's recent church activity.

Although Mr. Prince admitted that such evidence might have constituted a mitigating circumstance, he explained why he did not investigate the matter more fully or present this line of defense:

> I think it would have been rather difficult. Because at the same time frame that he was supposedly trying to turn his life around was when he went over to Connie McKinney's, the lady next door, and tried to assault his wife just a week or two before the murder.
> So this was during the same time frame that he was supposedly turning his life around.

Evid. Hear. at 77.

In our view, Mr. Prince acted reasonably in concluding that this line of defense did not require further investigation. The record indicates that the prosecution likely would have questioned Wanda and Joe Howard about their knowledge of Mr. Duvall's long history of drug and alcohol abuse, his tendency

- 24 -

toward violence when drunk, and his prior physical abuse of Karla. Furthermore, Mr. Duvall's behavior during the weeks preceding Karla's murder belied the sincerity of his alleged reform. Mr. Prince's decision not to present evidence of Mr. Duvall's turnaround was reasonable because of the substantial risk that this highly disputable evidence would lead directly to the introduction of evidence with a negative impact that would far outweigh any mitigating effect.

### 4. Remorse

Mr. Duvall also asserts that Mr. Prince should have presented evidence regarding Mr. Duvall's remorse. In particular, Mr. Duvall asserts that Mr. Prince should have told the jury that Mr. Duvall was depressed and suicidal after the murder.

Contrary to Mr. Duvall's assertions, the record discloses that the jury was well aware of Mr. Duvall's remorse. The jury heard Mr. Duvall cry during one or more of his confessions. Instruction No. 8 expressly required the jury to consider Mr. Duvall's remorse as a mitigating circumstance. The instruction also reminded the jury that Mr. Duvall had surrendered himself, had informed the authorities about the killing and its details, and that no law enforcement agency had previous knowledge of Karla's death. Mr. Prince emphasized Mr. Duvall's remorse in closing arguments:

> Now, remorse. What does it take for remorse. Some people cry inside. Some people don't. You heard the statements. You heard

the tape. What did the tape show you. The very first tape. No one forced him to say anything. He came to the District Attorney's Office to look for Assistant D.A. . . . . . They asked him, John, are you telling us this because you regret it. Naturally I regret it . . . .

Tr. at 778.

In sum, our review of the record indicates that Mr. Prince presented substantial evidence of Mr. Duvall's remorse. Thus, we hold that Mr. Prince's failure to specifically mention Mr. Duvall's depression and suicidal tendencies was not unreasonable and did not constitute ineffective assistance of counsel.

### 5. Victim's Drug Use

Mr. Duvall contends that Mr. Prince should have investigated and produced evidence that Karla Duvall was a drug user and that, during the weeks before Karla's death, John Duvall repeatedly encouraged her to stop using drugs. Although Mr. Prince initially thought that Karla's drug use might be the source of mitigating evidence because it could support Duvall's claim that he was frustrated by her drug abuse, after investigation he concluded otherwise.

As a result of conversations with Mr. Duvall, Mr. Prince investigated a number of leads dealing with Karla's recent drug use. One doctor from whom Karla had purportedly illegally obtained drugs indicated that Karla's drug prescriptions "were just normal." Evid. Hear. at 72. Two potential witnesses, Stanley Puet and Kenneth Atkinson, denied that they had ever helped Karla obtain drugs. When Mr. Prince spoke with Jerry Duvall before trial about Karla's drug

use, Mr. Prince concluded that Jerry Duvall had no direct knowledge that Karla had recently used drugs. At the time of trial, Mr. Prince was unable to find any witnesses willing to testify that they gave or sold drugs to Karla or that they witnessed Karla using drugs in the months leading up to the murder. In fact, Mr. Duvall himself disclosed to Mr. Prince that Mr. Duvall had overstated Karla's drug use: "[Mr. Duvall] told me on many occasions that she wasn't really that much of a pill user . . . ." Evid. Hear. at 90.

In addition to a lack of witnesses to Karla's drug use, the record contains substantial evidence that she was not using drugs at the time of the murder. The state's medical examiner, Dr. Fred Jordan, testified that he found no needle marks on Karla's body and no drugs in her system at the time of the murder. Evid. Hear. at 86, 90. Connie McKinney, the victim's neighbor, testified that Karla did not appear to be under the influence of drugs when she spoke with Karla on the evening of her death. Tr. at 666. Ms. McKinney also testified that she had not observed Karla using drugs during the year that she had known the victim. Id.

Faced with no objective evidence of Karla's drug use and reliable evidence to the contrary, Mr. Prince was unable to find a single witness to testify firsthand about Karla's drug purchases or abuse. We therefore conclude that Mr. Prince's decision not to present evidence that John Duvall urged Karla Duvall to stop

abusing drugs in the weeks prior to her death was a reasonable strategic choice based upon reasonable investigative efforts.

### 6. Summary

After carefully reviewing the record, we are unpersuaded that Mr. Duvall's trial counsel inadequately investigated and prepared for the penalty phase of the trial. Although Mr. Duvall's trial counsel could have investigated several other leads, we agree with the courts below that Mr. Prince's decision not to conduct more exhaustive investigation was supported by reasonable professional judgment. Moreover, Mr. Prince's decisions concerning the presentation of evidence of Mr. Duvall's family history, substance abuse, remorse, church attendance, and attempts to stem Karla's purported drug consumption fall within the broad range of reasonable trial strategy. This is especially true given the complications created by Duvall's decision not to testify three days after the trial had begun. Thus, we hold that the representation received by Mr. Duvall during the penalty phase of his trial fell within the range of reasonable legal assistance that complies with the Sixth Amendment.

### C. Prejudice

In addition to our conclusion that Mr. Prince acted reasonably, we find that there is no reasonable probability that the omitted evidence would have changed the jury's conclusion that the balance of aggravating and mitigating circumstances

warranted death.  See Strickland, 466 U.S. at 695.  In evaluating the probability of a different outcome, we must "keep in mind the strength of the government's case and the aggravating factors the jury found as well as the mitigating factors that might have been presented."  Stafford, 34 F.3d at 1564.  Both the government's case against Mr. Duvall and the aggravating factors weighing in favor of a death sentence were particularly strong.  No one disputes that Karla Duvall was brutally murdered by a man who had been convicted of violent felonies in the past.  Moreover, the record clearly indicates that if Mr. Prince had introduced the omitted evidence, the jury would have learned about the details of Mr. Duvall's criminal record and violent tendencies, possibly offsetting any potential mitigating effect.  Under these circumstances, Mr. Duvall has failed to demonstrate a reasonable probability that the outcome of his sentencing would have been different.  Thus, we conclude that Mr. Duvall is not entitled to habeas relief on his ineffective assistance of counsel claim.

## II.    EXCULPATORY EVIDENCE

In his second claim, Mr. Duvall asserts that the prosecution violated his Fourteenth Amendment due process rights by failing to disclose a material exculpatory statement to the defense.  On January 8, 1987, Mr. Duvall's attorney filed a "Motion to Produce Information Necessary to Receive a Fair Trial."  In the motion, Mr. Duvall specifically requested:

6. Any information within the District Attorney's possession or control which tends to negate the guilt of the accused or which would tend to reduce his punishment.

7. Any statement pertaining to this cause of any person taken by the District Attorney or his assistants, or any of their agents.

. . . .

11. The District Attorney's entire file on the victim or any reports prepared by law enforcement personnel that relate to the victim.

R. at 40. At a hearing on April 9, 1987, the State advised Mr. Duvall's attorney that he had disclosed all exculpatory evidence in the government's files. The trial judge nevertheless concluded that he would review the files. No additional information was produced as a result of the trial judge's review.

Mr. Duvall contends that despite the district attorney's assurances and the trial judge's review, the district attorney failed to reveal the substance of an assistant district attorney's conversation with Lynn Howard, a former neighbor of the Duvalls. Ms. Howard allegedly stated that she had observed Karla Duvall "shooting up drugs." Ms. Howard also allegedly told the assistant district attorney that the abscesses on Karla's body resulted from "shooting drugs." Duvall v. Reynolds, No. CIV-94-404-M, slip op. at 11 (W.D. Okla. Aug. 22, 1996).

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The materiality requirement is met "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). In other, words, evidence is material "when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles v. Whitley, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678); see also United States v. Hernandez, 94 F.3d 606, 610 (10th Cir. 1996).

Mr. Duvall concedes that Ms. Howard's statement would not have altered the outcome of the guilt phase of the trial. Mr. Duvall does argue, however, that there is a reasonable probability that Ms. Howard's information would have changed the result in the penalty phase of the trial. Mr. Duvall asserts that Ms. Howard's statements would have supported his theory that he had spent the morning of the murder trying to stop his wife's drug use. Such mitigating evidence, Mr. Duvall contends, would have been critical during the penalty phase of the trial.

We disagree. After reviewing the entire record, we conclude that there is no reasonable probability that disclosure of Ms. Howard's statement would have produced a different verdict. The jury was already aware that Mr. Duvall claimed

that he murdered his wife because of her drug use.  Moreover, when Mr. Duvall's

attorney investigated Mr. Duvall's claims that Karla abused drugs, he found no

other objective evidence to support these claims.  For example, the state's medical

examiner, Dr. Fred Jordan, testified that he found no evidence of drug use by the

victim.  In addition, Connie McKinney, the victim's neighbor, testified that Karla

did not appear to be using drugs when she spoke with her on the evening of her

death.  Ms. McKinney also testified that she had not observed Karla using drugs

in the year that Ms. McKinney had known the victim.  Under these circumstances,

we are confident that the outcome of the penalty phase would have been the same

had this evidence been disclosed to the defense.  Thus, Mr. Duvall is not entitled

to habeas relief on this ground.


## III.   LESSER-INCLUDED OFFENSE

Mr. Duvall next contends that the district court violated his Fourteenth

Amendment due process rights by instructing the jury only on first degree murder[3]

---

[3] Under Oklahoma law, "[a] person commits murder in the first degree when he
unlawfully and with malice aforethought causes the death of another human being.
Malice is that deliberate intention unlawfully to take away the life of a human being,
which is manifested by external circumstances capable of proof." Okla. Stat. Ann. tit. 21,
§ 701.7(A) (West 1983).  The design to effect death "is inferred from the fact of killing,
unless the circumstances raise a reasonable doubt whether such design existed." Okla.
Stat. Ann. tit. 21, § 702 (West 1983).  Moreover, "[a] design to effect death sufficient to
constitute murder may be formed instantly before committing the act by which it is
(continued...)

and refusing to instruct the jury on second degree murder[4] and first degree manslaughter.[5]  In <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980), the Supreme Court held that in a capital case, due process requires that a jury be given the option of convicting a defendant on a lesser included noncapital offense if the evidence would support conviction on that offense.  The Court in <u>Beck</u> sought to avoid presenting juries with a "death or nothing" choice between conviction of a capital crime and finding the defendant not guilty.  <u>Id.</u>  Such a choice, the Court explained, is unacceptable because "the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished."  <u>Id.</u> at 642.  The risk of such a choice "cannot be tolerated in a case in which the defendant's life is at stake."  <u>Id.</u> at 637; <u>see also</u>

---

[3](...continued)
carried into execution."  Okla. Stat. Ann. tit. 21, § 703 (West 1983).

[4] A homicide constitutes second degree murder "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual."  Okla. Stat. Ann. tit. 21, § 701.8(1) (West 1983).

[5] A person commits manslaughter in the first degree when the homicide is "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."  Okla. Stat. Ann. tit. 21, § 711(2) (West 1983).

- 33 -

Hopper v. Evans, 456 U.S. 605, 610 (1982); Schad v. Arizona, 501 U.S. 624, 646 (1991); Trujillo v. Sullivan, 815 F.2d 597, 601 (10th Cir. 1987).

A state, however, is not required to "create a noncapital murder offense for every set of facts under which a murder may be committed." Hatch v. State, 58 F.3d 1447, 1454 (10th Cir. 1995). A trial court must instruct the jury on a noncapital offense as defined by state law only if the evidence would have supported such a verdict. Beck, 447 U.S. at 627. Mr. Duvall argues that the record contains sufficient evidence to support a verdict of second degree murder or first degree manslaughter instruction. We disagree.

At trial, the jury heard Mr. Duvall's confession to law enforcement officers three days after the murder. Mr. Duvall explained that he received a telephone call from his wife at 3:00 pm on the afternoon of the murder. He stated that he was angry because she told him that she had resumed taking illegal drugs. At about 9:00 pm, he arrived at his wife's duplex. He waited on the porch of the duplex next door. At about 10:30 pm, after the neighbors left, he knocked on his wife's door. In his confession, Mr. Duvall stated:

> Karla came to the door and said, where's Mark. I said, he's at mom's, and I just grabbed her by the throat and threw her down and grabbed the ashtray. I hit her in the head with it, and drug her into the kitchen. Opened the drawer and grabbed a knife and stabbed her several times. She pulled the drawer out. She pulled both those drawers out, and knives and all those things all over the floor. But that didn't--that wasn't what killed her. She wanted me to put her in

- 34 -

bed--wash her off.  So I took her in the shower and washed her off, and put her in the bed and suffocated her.

Tr. at 616.   He continued:

[A]fter I took her back to bed, she asked me to help her, and I said well, Karla, I think it's too late for that, and that's when I--she was laying with a pillow under her head.  I got the other one.  I put it over her head.

Tr. at 624.

After reviewing the record, we find no evidence that Mr. Duvall acted in the "heat of passion" as required by section 711(2) (first degree manslaughter) or "without any premeditated design" as required by section 701.8(1) (second degree murder).  Karla's death occurred around 11:00 pm—over seven hours after she allegedly made the provoking phone call to Mr. Duvall.  There is no evidence of new provocation between the time of the phone call and her death.  The time between the alleged provocation and Karla's death was sufficient for the passion of a reasonable man to cool.  Moreover, Mr. Duvall made a conscious decision to suffocate his wife after washing her off in the shower.  The evidence is insufficient for a reasonable jury to conclude that Mr. Duvall acted without any premeditated design.  Because the evidence did not support an instruction on murder in the second degree or manslaughter in the first degree, Mr. Duvall was not entitled to such an instruction.  We therefore deny Mr. Duvall habeas relief on this ground.

## IV. PRIOR BAD ACTS

In his fourth claim, Mr. Duvall contends that his Fourteenth Amendment rights were violated because the trial court permitted the State to introduce evidence of a number of his prior "bad acts." In particular, Mr. Duvall argues that the testimony of Connie McKinney and Donald Bobbett violated his due process rights.

"[S]tate court rulings on the admissibility of evidence may not be questioned in federal habeas proceedings unless they render the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." Tucker v. Makowski, 883 F.2d 877, 881 (10th Cir. 1989) (internal quotation marks and citations omitted). "[W]e will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law." Hopkinson v. Shillinger, 866 F.2d 1185, 1197 (10th Cir. 1989).

At trial, the prosecution introduced evidence of Mr. Duvall's prior acts of violence towards Karla in order to rebut Mr. Duvall's anticipated defense of provocation. Ms. McKinney, the victim's neighbor, testified about an incident that occurred one to two weeks before the murder. Ms. McKinney stated that Karla ran over to her apartment and asked Ms. McKinney's son to lock the door.

Karla then hid under Ms. McKinney's kitchen table. Karla was so frightened that her trembling caused the table to shake. Ms. McKinney offered to call the police. Karla stated that her husband would kill her if he was arrested. When Mr. Duvall arrived, Ms. McKinney refused to open the door. Mr. Duvall then threatened to "get" Ms. McKinney as well as his wife. Tr. at 678. When Ms. McKinney informed Mr. Duvall that she had called her brother, Mr. Duvall threatened to "get" him in addition to the women. Id.

Mr. Bobbett, the victim's brother, testified about an incident that occurred about three weeks before Karla Duvall's death. Mr. Bobbett stated that he received a phone call from Karla after she had fought with Mr. Duvall. Karla asked Mr. Bobbett to come and pick her up. When Mr. Bobbett arrived at Karla's, she told him that Mr. Duvall would kill her if she left him.

In admitting the testimony of Ms. McKinney and Mr. Bobbett, the trial court advised the jury that the statements were not introduced for the truth of the matter asserted. The court emphasized that the testimony related only to the issue of provocation.[6] Because Mr. Duvall failed to introduce sufficient evidence of

---

[6] In admitting the testimony of Ms. McKinney, the court advised the jury: Ladies and gentlemen, let me interrupt at this point to speak concerning the statement that you have heard that was made. That statement is introduced, not for the truth of the matter related in the statement, but only as that statement relates to the state of mind of the deceased, Karla Duvall, in relation to the defendant, John Duvall. Not for the truth of the statement,

(continued...)

- 37 -

provocation, however, the trial judge instructed the jury to disregard the

testimony. Instruction No. 10 provided:

> During the trial, you heard the testimony of Connie McKinney and Don Bobb[e]tt as to certain statements made by the decedent, Karla Duvall, as to threats related to her by the defendant. You were instructed during the trial that you could consider the statements only as they might relate to the Decedent's state of mind.
>
> At this point, you are instructed to disregard all statements of the decedent, as they are not relevant to any of the issues you will be called upon to decide.

R. at 151.

Mistakenly admitted evidence of prior crimes or convictions can, in some

instances, "imping[e] upon the fundamental fairness of the trial itself." United

States v. Parker, 604 F.2d 1327, 1329 (10th Cir. 1979), overruled on other

---

[6](...continued)
but only as it may shed light as to the state of mind of the decedent.

Tr. at 674-75. Similarly, in admitting the testimony of Mr. Bobbett, the court explained to the parties out of the presence of the jury:

The only reason I'm letting them in, statements made by defense counsel that he believes by the time the evidence is over, that the Court would instruct this jury on manslaughter. Now, manslaughter requires adequate provocation, and I'm using by analogy, or reasoning by analogy that that's very close to self-defense type of matter, or although that's not being pled. In other words, the Defendant indicated some action by the decedent in this matter that would cause, or adequate provocation, sufficient to cause heat of passion. Now, if that doesn't occur, I don't know where we stand in this matter. Otherwise, these type of statements are irrelevant.

Tr. at 703-04.

grounds by <u>United States v. Pennon</u>, 816 F.2d 527, 528 (10th Cir. 1987). This court, however, as well as other circuits, has found that the improper admission of evidence of prior acts does not rise to the level of constitutional error if the trial judge later instructs the jury to disregard the evidence. <u>See</u> <u>Scrivner v. Tansy</u>, 68 F.3d 1234, 1239-40 (10th Cir. 1995); <u>Warden v. Wyrick</u>, 770 F.2d 112, 116 (8th Cir. 1985); <u>McAffee v. Procunier</u>, 761 F.2d 1124, 1127 (5th Cir. 1985) ("This Court has held that such instructions to disregard often cure error."); <u>cf.</u> <u>United States v. Parker</u>, 604 F.2d 1327, 1329 (10th Cir. 1979) (finding guilty verdict fundamentally unfair where the court improperly admitted evidence of prior conviction with no corrective instruction). The trial judge in this case instructed the jury to "disregard all statements of the decedent" about which Ms. McKinney and Mr. Bobbett had testified. R. at 151. Because the court gave this instruction, and because there is no reason to believe that the jury did not adhere to it, we conclude that there was no error at the trial.

Even if we were to find that the admission of the prior acts testimony was constitutionally erroneous, we would conclude that the error was harmless. Federal courts grant habeas relief for errors of the "trial type" only when the error had a substantial and injurious effect in determining the jury's verdict. <u>Tuttle v. Utah</u>, 57 F.3d 879, 883 (1995) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)). The evidence in this case, including the confession of Mr. Duvall, amply

supports the guilty verdict and sentence, regardless of the testimony of Ms. McKinney and Mr. Bobbett.  Thus, we have no doubt that any error that might have occurred here was harmless.  Cf. O'Neal v. McAninch, 513 U.S. 435, 436-42 (1995) (requiring relief to be granted if harmlessness of the error is in "grave doubt").  For the above reasons, Mr. Duvall is not entitled to habeas relief on this ground.

## V.   EVIDENCE OF THE VICTIM'S DRUG CHARGE

In his fifth claim, Mr. Duvall asserts that his Fourteenth Amendment rights were violated because the trial court refused to allow Mr. Duvall to present evidence that Karla had pled guilty to a felony drug charge.  At trial, the jury heard an audiotape of Mr. Duvall's confession to Sheriff Alexander.  In his confession, Mr. Duvall stated that he killed his wife after she told him in a telephone conversation that she was resuming her use of illegal drugs.  He explained that Karla was angry because he had called her doctor to cancel her prescription.  Mr. Duvall stated that his wife told him that she had secured an alternate supply of the drug despite his efforts to prevent her from using drugs.

The defense sought to cross-examine Sheriff Alexander by introducing evidence that Karla Duvall had pled guilty to a felony drug charge.  The trial judge sustained the state's objection:

I do want to point out for the Record a synopsis of conversations that occurred in Chambers yesterday following an objection by the State to Mr. Prince's attempt to elicit from the Sheriff evidence concerning drug usage of the decedent, Karla Duvall. The general objection was made on the basis of character evidence. We went into Chambers and reviewed the Statutes, including Section 2404 of Title 12, and at the end of all the conversations, the Court's ruling was that Mr. Prince could go into the general reputation and character of the decedent for drug use, but the sticking point was in reference to this charge that had been filed, which was a . . . case that Mrs. Duvall had received a Deferred Imposition of Sentence, and the Court's ruling was that Mr. Prince could not elicit testimony concerning that, since it was not a conviction.[7]

Tr. at 753.

As discussed above in Part IV, on habeas review we are not concerned with whether the trial court properly excluded evidence of Karla Duvall's drug charge under the Oklahoma rules of evidence. Hopkinson, 866 F.2d at 1200. Instead, to be eligible for federal habeas relief, a petitioner must prove that the state trial court's evidentiary ruling rendered the "trial so fundamentally unfair as to constitute a denial of federal constitutional rights." Id. at 1197. Our inquiry "hinges on the materiality of the excluded evidence to the defense." Matthews v. Price, 83 F.3d 328, 331 (10th Cir. 1996).

---

[7] Under Oklahoma law, after a defendant enters a plea of guilty, the court may defer further proceedings upon specific conditions. Upon completion of the conditions, the defendant is discharged without a court judgment of guilt, and the court orders the guilty plea to be expunged from the record. See, e.g., OKLA. STAT. tit. 22, § 991(c) (West 1986).

- 41 -

We hold that the trial court's exclusion of the victim's drug charge did not render Mr. Duvall's trial so fundamentally unfair as to warrant habeas relief. As the Oklahoma Court of Criminal Appeals noted in Mr. Duvall's direct appeal, the victim's death occurred approximately seven hours after the telephone call. Duvall, 825 P.2d at 627-28. Although the evidence may have had some relevance to Mr. Duvall's theory of provocation, the evidence would nonetheless be ineffectual in light of the other undisputed evidence that Mr. Duvall did not meet the requirements for an instruction on manslaughter or second degree murder, as discussed in Part III. The admission of Karla's drug charge would not have required the trial judge to instruct the jury on any lesser-included offense. The seven-hour cooling off period and the absence of any other evidence that would tend to support a charge of manslaughter or second degree murder rendered Karla's drug conviction immaterial to any issue in the case. As such, we conclude that the exclusion of Karla Duvall's drug conviction did not render the trial fundamentally unfair. We therefore conclude that Mr. Duvall is not entitled to habeas relief on this ground.

## VI.  JURY INSTRUCTION ON AGGRAVATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT

In his sixth claim, Mr. Duvall contends that his Eighth and Fourteenth Amendment rights were violated because the district court failed to instruct the

jury that it had the option to return a life sentence regardless of its finding that

the aggravating circumstances outweighed the mitigating circumstances.[8]  Under

Oklahoma law, a jury is free to decline to impose the death penalty even if it finds

that the aggravating circumstances outweigh the mitigating circumstances.  See

Burrows v. State, 640 P.2d 533, 544 (Okla. Crim. App. 1982).  Nonetheless, the

Constitution does not demand "that the state must affirmatively structure in a

particular way the manner in which juries consider mitigating evidence."

Buchanan v. Angelone, 118 S. Ct. 757, 761 (1998).  Instead, "the state may shape

and structure the jury's consideration of mitigation so long as it does not preclude

the jury from giving effect to any relevant mitigating evidence. . . . [T]he standard

for determining whether jury instructions satisfy these principles [is] 'whether

there is a reasonable likelihood that the jury has applied the challenged

---

[8] The Oklahoma Court of Criminal Appeals did not address the merits of this issue on either direct or habeas review.  We note that the Court of Criminal Appeals has consistently rejected this argument.  See, e.g., Valdez v. State, 900 P.2d 363, 385 (Okla. Crim. App. 1995); Bryson v. State, 876 P.2d 240, 262-63 (Okla. Crim. App. 1994); Pickens v. State, 850 P.2d 328, 339 (Okla. Crim. App. 1993); Romano v. State, 847 P.2d 368, 392 (Okla. Crim. App. 1993); Fisher v. State, 845 P.2d 1272, 1277-78 (Okla. Crim. App. 1992).  We express no opinion on the rationale for these decisions, that to give such an instruction would constitute "jury nullification," see Walker v. State, 723 P.2d 273, 284 (Okla. Crim. App. 1986), because we hold that the instruction adequately informed the jury of its discretion to impose the death penalty, including by implication the option to impose life imprisonment even if the aggravating circumstances outweighed the mitigating.

instruction in a way that prevents the consideration of relevant evidence.'" Id. (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

In accordance with these principles, Instruction No. 6 provided:

> Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.
> If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the Death Penalty. In that event, the sentence must be Imprisonment for Life.

R. at 174 (emphasis added).

We hold that Instruction No. 6 adequately afforded the jury an opportunity to consider mitigating evidence. The trial court did not instruct the jury that they must assess death if they found the aggravating circumstances outweighed the mitigating circumstances. Instead, the trial court instructed the jury that they were "authorized to consider imposing a sentence of death" upon the finding of an aggravating circumstance. Because the instruction did not prevent consideration of mitigating circumstances, and because no juror would have understood it to do so, the instruction is constitutionally permissible. See Buchanan, 118 U.S. at 761 (approving instruction stating that when an aggravating circumstance is present beyond a reasonable doubt, "then you may fix the punishment at death.") (emphasis added).

Mr. Duvall's reliance on <u>Moore v. Kemp</u>, 809 F.2d 702 (11th Cir. 1987) is misplaced. In <u>Kemp</u>, like this case, the jury instructions stated that the jury "would be authorized to consider" the death penalty upon finding a statutory aggravating circumstance. <u>Id.</u> at 732. Unlike this case, however, the instructions in <u>Kemp</u> then stated that if an aggravating circumstance were found, "the form of your verdict would be . . . death." <u>Id.</u> The Eleventh Circuit held that the jury instruction was unconstitutional because the inconsistency created by the use of both permissive and mandatory language created an unacceptable risk that an average juror would conclude "that the existence of an aggravating circumstance necessitated a death sentence." <u>Id.</u> at 733.

Unlike the instruction in <u>Kemp</u>, the instruction in this case contains only permissive language, which informs the jury that they were not required to impose the death penalty upon a finding of an aggravating circumstance. Instruction No. 6 does not contain the same inconsistency as the instruction at issue in <u>Kemp</u>, and thus does not suffer from the same constitutional infirmity. <u>See</u> <u>Thomas v. State</u>, 811 P.2d 1337, 1347 (Okla. Crim. App. 1991) (distinguishing <u>Kemp</u>). We are confident that "the instruction adequately apprised the jury of its option not to recommend the death sentence." <u>Moore v. Butler</u>, 819 F.2d 517, 521 (5th Cir. 1987) (approving instruction that informed the jury that it "may consider" imposing the death penalty upon finding an aggravating circumstance beyond a

reasonable doubt). In sum, we hold that "the instructions sufficiently preserved, under the Constitution, the jury's responsibility and authority to exercise its discretion in the sentencing determination." Coleman v. Saffle, 869 F.2d 1337, 1394 (10th Cir. 1989). Therefore, Mr. Duvall is not entitled to habeas relief on this ground.

**VII. JURY UNANIMITY ON THE EXISTENCE OF MITIGATING CIRCUMSTANCES**

In his seventh claim, Mr. Duvall asserts that his Eighth and Fourteenth Amendment rights were violated because the jury instructions did not inform the jury that unanimous agreement upon the existence of a mitigating circumstance is not required before each juror can consider such evidence. Relying primarily on McKoy v. North Carolina, 494 U.S. 433 (1990), and Mills v. Maryland, 486 U.S. 367 (1988), Mr. Duvall contends that the jury instructions erroneously implied that the jury was required to find a mitigating circumstance unanimously before each juror could consider the mitigating circumstance in determining whether to impose the death penalty.

In McKoy and Mills, the Supreme Court held that a unanimity requirement concerning mitigating circumstances resulted in an unconstitutional death sentence. McKoy, 494 U.S. at 944; Mills, 486 U.S. at 375. In both cases, the Court reasoned that allowing a holdout juror to prevent the other jurors from

- 46 -

considering mitigating evidence violated the principle established in <u>Lockett v.</u> <u>Ohio</u>, 438 U.S. 586 (1978), <u>i.e.</u>, that a sentencer may not be precluded from giving effect to all mitigating evidence. <u>McKoy</u>, 494 U.S. at 438; <u>Mills</u>, 486 U.S. at 375.

A trial court need not, however, expressly instruct a capital sentencing jury that unanimity is not required before each juror can consider a particular mitigating circumstance. <u>See</u> <u>Buchanan v. Angelone</u>, 118 S.Ct. 757, 761 (1998) ("[T]he State may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence."). Instead, as noted above, our standard for determining whether jury instructions violate the constitution is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990), <u>quoted in</u> <u>Buchanan</u>, 118 S.Ct. at 761; <u>accord</u> <u>Davis v.</u> <u>Executive Dir. of Dept. of Corrections</u>, 100 F.3d 750, 775 (1990) (10th Cir. 1996).[9]

_____

[9] The Oklahoma Court of Criminal Appeals did not address the merits of this issue on either direct or habeas review. Nevertheless, the Court of Criminal Appeals has consistently held that similar jury instructions comply with <u>McKoy</u> and <u>Mills</u>. <u>See</u> <u>Ledbetter v. State</u>, 933 P.2d 880, 898-99 (Okla. Crim. App. 1997); <u>Knighton v. State</u>, 912 P.2d 878, 896 (Okla. Crim. App.), <u>cert. denied</u>, 117 S. Ct. 120 (1996); <u>LaFevers v. State</u>, 897 P.2d 292, 309-10 (Okla. Crim. App. 1995); <u>Mayes v. State</u>, 887 P.2d 1288, 1320

(continued...)

In pertinent part, the trial court in this case gave the following instructions relevant to the mitigating and aggravating circumstances:

**Instruction No. 6**
Should you <u>unanimously find</u> that one or more <u>aggravating circumstances</u> existed beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.
If you do not <u>unanimously find</u> beyond a reasonable doubt that one or more of the <u>aggravating circumstances</u> existed, you are prohibited from considering the Death Penalty. In that event, the sentence must be Imprisonment for Life.

**Instruction No. 7**
Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. <u>The determination of what are mitigating circumstances is for you as Jurors to resolve under the facts and circumstances of this case.</u>

**Instruction No. 8**
Evidence has been offered as to the following mitigating circumstances:
[list]
<u>Whether these circumstances existed, and whether these circumstances are mitigating, must be decided by you.</u>

**Instruction No. 9**
If you <u>unanimously find</u> that one or more of the <u>aggravating circumstances</u> existed beyond a reasonable doubt, unless you also <u>unanimously find</u> that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances, the Death Penalty shall not be imposed.

---

[9](...continued)
(Okla. Crim. App. 1994); <u>Harjo v. State</u>, 882 P.2d 1067, 1081 (Okla.. Crim. App. 1994); <u>Stiles v. State</u>, 829 P.2d 984, 997 (Okla.. Crim. App. 1992).

**Instruction No. 10**
If you <u>unanimously find</u> that one or more of the <u>aggravating circumstances</u> existed beyond a reasonable doubt, the Law requires that you reduce such findings to writing by stating specifically what aggravating circumstances existed, if any.  This finding must be made a part of your Verdict.

You must indicate this finding by checking the box next to such aggravating circumstances on the appropriate Verdict form furnished you, and such Verdict form must be signed by your Foreman.

The Law does not require you to reduce to writing the mitigating circumstances you <u>find,</u> if any.

R. at 174-78 (emphasis added).

The instructions consistently require unanimity <u>only</u> on the jury's finding of aggravating circumstances.  Instruction Nos. 6 and 10 require the jury to "unanimously find" aggravating circumstances.  In contrast, none of the instructions involving mitigating circumstances impose an express or implied unanimity requirement on the jury's consideration of mitigating evidence.  Instruction Nos. 7, 8, and 10 respectively required the jury to "determin[e]," "decide[]," and "find" whether mitigating circumstances existed without any reference to unanimity.  Although Instruction No. 9 requires the jury to find unanimously that the aggravating circumstances outweigh any mitigating circumstances before imposing the death penalty, the unanimity requirement there refers only to the jury's balancing of aggravating versus mitigating circumstances, and not to the initial determination of whether mitigating circumstances exist in

- 49 -

the first place. Thus, Instruction No. 9 is consistent with the instructions describing the proper evaluation of mitigating evidence.

We hold that there is no reasonable likelihood that the jury applied these instructions in a way that required them to agree unanimously upon the existence of a mitigating circumstance before considering it. Thus, Mr. Duvall is not entitled to habeas relief on this ground.

## VIII. "HEINOUS, ATROCIOUS, OR CRUEL" AGGRAVATING CIRCUMSTANCE

Mr. Duvall next challenges the "especially heinous, atrocious, or cruel" aggravating circumstance under the Eighth and Fourteenth Amendments. He asserts that Instruction No. 5, which defines the aggravating circumstance, is unconstitutionally vague as applied. Instruction No. 5 provides:

> As used in these Instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the suffering of others.
> The phrase "especially heinous, atrocious or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse.

R. at 173.

A statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 427-33 (1980) (invalidating an

"outrageously or wantonly vile, horrible and inhuman" aggravating circumstance). Based on this principle, in Cartwright v. Maynard, 822 F.2d 1477, 1478-79 (10th Cir. 1987) (en banc), we held that an "especially heinous, atrocious, or cruel" aggravator was unconstitutional because it failed to channel the jury's discretion as required by the Eighth Amendment. Affirming our decision, the Supreme Court reasoned that without precise explanatory language to guide the sentencing decision, "an ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" Maynard v. Cartwright, 486 U.S. 356, 364 (1988).

In Cartwright, the Supreme Court noted that Oklahoma could have cured the unconstitutionally vague aggravator by adopting a narrowing construction. Id. at 364-65. In particular, the Court suggested that if the Oklahoma courts had construed the aggravating circumstance to require "torture or serious physical abuse," such a construction "would be constitutionally acceptable." Id.; see also Walton v. Arizona, 497 U.S. 639, 654-55 (1990).

In response to the Cartwright decision, the Oklahoma Court of Criminal Appeals adopted a limiting construction of the "especially heinous, atrocious, or cruel" aggravator, mandating that the murder involve "torture of the victim or serious physical abuse." See Stouffer v. State, 742 P.2d 562, 563 (Okla. Crim. App. 1987). In Hatch v. State, 58 F.3d 1447, 1468-69 (10th Cir. 1995), we agreed

- 51 -

that such a narrowing interpretation of the "especially heinous, atrocious, or cruel" aggravator was constitutionally permissible.

Despite our holding in Hatch, Mr. Duvall argues that the "especially heinous, atrocious, or cruel" aggravator is unconstitutionally vague. He asserts that the Oklahoma Court of Criminal Appeals has applied this factor with "remarkable inconsistency." Appellant's Br. at 37. Thus, he contends that as applied, the aggravating circumstance does not "'genuinely narrow the class of persons eligible for the death penalty.'" Lowenfield v. Phelps, 484 U.S. 231, 244 (1988) (quoting Zant v. Stephens, 462 U.S. 862, 877 (1983)).

We disagree with Mr. Duvall's characterization of the case law from the Oklahoma Court of Criminal Appeals. In our view, the court has consistently interpreted the "especially heinous, atrocious, or cruel" aggravator to require "torture" and "serious physical abuse" as evidenced by proof of conscious physical suffering. See Stafford v. State, 832 P.2d 20, 23 (Okla. Crim. App. 1992) ("Absent evidence of conscious physical suffering of the victim prior to death, the required torture or serious physical abuse standard is not met." (quoting Battenfield v. State, 816 P.2d 555 (Okla. Crim. App. 1991), cert. denied, 503 U.S.

943 (1992))). In addition, that court has applied its standard consistently in evaluating whether or not the evidence justifies a finding of this aggravator.[10]

We conclude that the record contains sufficient evidence for a jury to find that Karla Duvall suffered torture or serious physical abuse as interpreted by the Oklahoma courts. The record indicates that Karla was initially hit on the head with an ashtray. Tr. at 616. The state's medical examiner, Dr. Jordan, testified that Karla suffered "scattered bruises, generally relatively small, . . . a few very superficial puncture wounds," and "twenty-five definitive stab wounds, involving head, chest, abdomen and back." Tr. at 520. Dr. Jordan estimated that Karla

---

[10] In addressing this issue, we have reviewed cases in which the Oklahoma Court of Criminal Appeals upheld the application of the "especially heinous, atrocious, or cruel" aggravator. See Mollett v. State, 939 P.2d 1, 13-14 (Okla. Crim. App. 1997); Ledbetter v. State, 933 P.2d 880, 896 (Okla. Crim. App. 1997); Smith v. State, 932 P.2d 521, 535-36 (Okla. Crim. App. 1996), cert. denied, 117 S. Ct. 2522 (1997); Charm v. State, 924 P.2d 754, 771 (Okla. Crim. App. 1996), cert. denied, 117 S. Ct. 1560 (1997); Johnson v. State, 928 P.2d 309, 313, 321 (Okla. Crim. App. 1996), cert. denied, 1997 WL 291877 (U.S. Oct. 6, 1997) (No. 96-9106); Hain v. State, 919 P.2d 1130, 1146-47 (Okla. Crim. App.), cert. denied, 117 S. Ct. 588 (1996); Neill v. State, 896 P.2d 537, 555 (Okla. Crim. App. 1994); Long v. State, 883 P.2d 167, 175 (Okla. Crim. App. 1994); Revilla v. State, 877 P.2d 1143, 1154-55 (Okla. Crim. App. 1994); Woodruff v. State, 846 P.2d 1124, 1146-47 (Okla. Crim. App. 1993); Boltz v. State, 806 P.2d 1117, 1125 (Okla. Crim. App. 1991); Nuckols v. State, 805 P.2d 672, 675-76 (Okla. Crim. App. 1991); Rojem v. State, 753 P.2d 359, 369 (Okla. Crim. App. 1988); Hale v. State, 750 P.2d 130, 143 (Okla. Crim. App. 1988). We also have reviewed cases in which the court reversed the jury's finding of the aggravator. See Cudjo v. State, 925 P.2d 895, 901-02 (Okla. Crim. App. 1996); cert. denied, 117 S. Ct. 981 (1997); Battenfield v. State, 816 P.2d 555, 565 (Okla. Crim. App. 1991); Moore v. State, 809 P.2d 63, 65 (Okla. Crim. App. 1991); Nguyen v. State, 769 P.2d 167, 174 (Okla. Crim. App. 1988); Brown v. State, 753 P.2d 908, 913 (Okla. Crim. App. 1988); Stouffer v. State, 742 P.2d 562, 563-64 (Okla. Crim. App. 1987).

"died . . . within five or ten minutes after receiving these wounds." Tr. at 535. Dr. Jordan also testified that the victim's "wounds would have been painful." Tr. at 536. He concluded that "[t]here [was] no head injury, including the stab wounds that would necessitate her being unconscious, or that would say yes, this lady was unconscious before these wounds [were inflicted]." Tr. at 571. In addition, during Mr. Duvall's confession on September 18, 1986, he admitted that his wife "never was unconscious." State's Ex. 24. Mr. Duvall told law enforcement officers that after he stabbed her, Karla asked for help. Id. Mr. Duvall responded, "[W]ell Karla, it's just too late for that." Id. He then took a pillow and suffocated her. Id.

In sum, we hold that the record sufficiently supports the jury's finding of serious physical abuse or torture under the "especially heinous, atrocious or cruel" aggravator. The aggravator is not unconstitutional on its face or as applied. We therefore conclude that Mr. Duvall is not entitled to habeas relief on this ground.

## IX. PROSECUTORIAL MISCONDUCT

In his ninth claim, Mr. Duvall argues that the prosecutor's conduct during closing arguments deprived him of due process. We review allegations of prosecutorial misconduct de novo. Fero v. Kerby, 39 F.3d 1462, 1473 (10th Cir. 1994). Prosecutorial misconduct does not warrant federal habeas relief unless the

conduct complained of "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); see also Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990). In evaluating whether improper prosecutorial comments render a trial fundamentally unfair, we view the comments within the context of the trial as a whole. United States v. Young, 470 U.S. 1, 11-12 (1985). "[N]ot every trial error or infirmity constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" Donnelly, 416 U.S. at 642 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)).

On appeal, Mr. Duvall complains that the prosecutor engaged in four improper tactics designed to inflame the passion and prejudice of the jury. We address each in turn.

First, Mr. Duvall argues that the prosecutor improperly informed the jury of his personal opinion of Mr. Duvall's guilt. During the guilt phase closing argument, the prosecutor stated:

> [I]f you find from the evidence . . . and in my mind, in my way of thinking, it's more than beyond a reasonable doubt . . . .

Tr. at 748. Although the prosecutor's personal comments on the evidence were improper, we hold that the comment did not deprive Mr. Duvall of due process. In so holding, we note that the defense attorney contemporaneously objected to the prosecutor's comment. The trial court then sustained the objection and

- 55 -

admonished the prosecutor for the comment in the presence of the jury.

Moreover, as the Oklahoma Court of Criminal Appeals emphasized on direct

appeal, "the strong evidence of [Duvall]'s guilt is clearly not circumstantial."

Duvall, 825 P.2d at 629.

Second, Mr. Duvall argues that the prosecutor improperly made repeated

comments on the blood and foul smell at the murder scene. In particular, he

directs us to the following statements during closing arguments:

> If you will recall, [Sheriff Alexander] said there was blood all over
> the house. I'll ask you, ladies and gentlemen, to look at State's
> Exhibit Number 4. Number 3. There is indeed blood all over the
> house. As a matter of fact, it looks like a slaughter house there in
> that—in that kitchen.

Tr. at 744 (guilt phase).

> The evidence was that the smell of decaying flesh was so strong that
> Sheriff Alexander had to make three attempts to enter into the
> premises to examine—to find Karla—to find out what happened to
> Karla.

Tr. at 771 (penalty phase). We hold that such remarks do not entitle Mr. Duvall

to habeas relief. In making these statements, the prosecutor did not misstate or

misrepresent the crime scene. Although "these remarks were unnecessary and are

not to be condoned," Duvall, 825 P.2d at 628, the statements did not render Mr.

Duvall's trial fundamentally unfair.

Third, Mr. Duvall asserts the prosecutor improperly remarked that Mr.

Duvall had "butchered" the victim during the penalty phase closing argument:

> He didn't tell them that . . . after he had butchered her with these knives and forks and left her body there dead . . . .

Tr. at 774.

> We do know however it was after he butchered her up there with those meat forks and other sharp instruments . . . .

Tr. at 791.

> [H]e can make excuses if he wants to, but there is no legal justification, ladies and gentlemen, for butchering this woman like he did, and he should be punished for it.

Tr. at 793. We hold that these statements did not render Mr. Duvall's trial fundamentally unfair. As before, the prosecutor's statements constituted accurate descriptions of the crime scene. "The prosecutor is allowed a reasonable amount of latitude in drawing inferences from the evidence during closing summation." United States v. Manriquez Arbizo, 833 F.2d 244, 247 (10th Cir. 1987). We agree with the Oklahoma Court of Criminal Appeals that "[t]he number of stab wounds suffered by the victim and the evidence of blood at the scene certainly supports a reasonable inference [of 'butchering'] consistent with the evidence." Duvall, 825 P.2d at 628. Thus, we hold that such statements did not deny Mr. Duvall due process.

Finally, Mr. Duvall contends that the prosecutor improperly appealed to the jury's sympathy for the victim during the penalty phase closing argument:

> Ladies and gentlemen, in this case you may find that only those who show mercy shall seek mercy, and that as a verdict of this jury, that

you may show him the same mercy that he showed Karla Duvall on the night of the 15th of September.

Tr. at 775.

> I want you, ladies and gentlemen, throughout your deliberations not to forget that there is more than one person that's involved in this situation. That Karla Duvall is not here, but Karla Duvall had rights also. Now we have spent four days here, ladies and gentlemen, trying to insure and guarantee that this Defendant, John Duvall, was shown, and it's in the instructions, concerning mitigation, fairness and mercy. He's had his day in court, and he's been treated fairly, and I submit to you, ladies and gentlemen, that John Duvall has been treated much more fairly, and with much more mercy than he showed Karla Duvall on September 15th of 1986.

Tr. at 788-89. We do not condone comments encouraging the jury to allow sympathy, sentiment, or prejudice to influence its decision. See Booth v. Maryland, 482 U.S. 496 (1987). Nevertheless, after reviewing the record, we cannot conclude that these comments affected the outcome of the penalty phase. The State's strong evidence of the aggravating circumstances of Karla's murder, from Duvall's confession and from the State's witnesses, makes it probable that the nature of the crime produced sympathy for the victim long before the prosecutor gave his closing remarks. See Robison v. Maynard, 829 F.2d 1501, 1509 (10th Cir. 1987) (finding that the strength of the State's case made it unlikely that prosecutor's comments encouraging sympathy for the victim affected the outcome). Thus, we are unable to find that the prosecutor's comments denied Mr. Duvall due process during the penalty phase.

In sum, the prosecutor's statements during closing arguments—separately or in conjunction with one another—would not have changed the outcome of the penalty phase and, therefore, did not so infect Mr. Duvall's trial with unfairness as to deny him due process. Accordingly, we conclude that Mr. Duvall is not entitled to habeas relief on this ground.

## X.  ADEQUATE NOTICE OF STATE'S EVIDENCE

In his last claim, Mr. Duvall argues that he is entitled to habeas relief because the district attorney's office failed to give his trial counsel adequate notice of the State's evidence in support of the "especially heinous, atrocious or cruel" aggravator. Mr. Duvall asserts that the Bill of Particulars did not list the particular acts that fell within this aggravator or identify the witnesses which the State intended to use to establish this aggravating circumstance. Mr. Duvall contends that the State's failure to provide him with significant critical facts resulted in trial by ambush in violation of due process.

In response, the State argues that Mr. Duvall is procedurally barred from raising this claim. Mr. Duvall did not raise this issue in his direct appeal. Although he attempted to raise the issue in his state post-conviction appeal, the Oklahoma Court of Criminal Appeals held that it lacked jurisdiction to reach the

merits because Mr. Duvall failed to file a Petition in Error and a copy of the

district court's order with the court pursuant to Rule 5.2(C) of the Rules of the

Court of Criminal Appeals.[11]  Duvall, 869 P.2d at 334.  At the time of Mr.

Duvall's appeal, Rule 5.2(C) provided:

> The applicant, or the state, desiring to appeal from the final
> order of the district court under [the rules governing post-conviction
> appeals], must file a petition in error WITH A COPY OF THE
> ORDER ATTACHED with the Clerk of this Court within thirty (30)
> days from the date of the final order of the district court; and at the

---

[11] Before the federal district court, the State argued that the procedural default rule applied to Mr. Duvall's ineffective assistance of counsel claim and his inadequate notice claim.  In denying Mr. Duvall habeas relief, the district court did not address the procedural default rule.  On appeal, the State argues only that the procedural default rule applies to Mr. Duvall's inadequate notice claim.

Given these circumstances, we hold that the procedural default rule is applicable only to Mr. Duvall's inadequate notice claim.  We emphasize that the State may waive the procedural default defense by failing to timely raise the issue.  See Jenkins v. Anderson, 447 U.S. 231, 234  n.1 (1980) ("[T]he respondent failed to raise the [procedural default] question in either the District Court or the Court of Appeals.  Ordinarily, we will not consider a claim that was not presented to the courts below."); Bailey v. Cowley, 914 F.2d 1438, 1439 (10th Cir. 1990) (per curiam) ("Respondents did not raise petitioner's procedural default as a defense below, however, nor have they raised it on appeal.  Therefore, we will deem the defense waived and will proceed to consider the petition on the merits.").  Moreover, we decline to raise the question sua sponte with respect to any other issue.  See United States v. Hernandez, 94 F.3d 606, 612 (10th Cir. 1996) (declining to apply the procedural default rule when the petitioner had not had the opportunity to demonstrate cause and prejudice); United States v. Allen, 16 F.3d 377, 378-79 (10th Cir. 1994) ("[I]f the government does not raise procedural bar, either the district  court or court of appeals may raise and enforce it sua sponte, if doing so furthers the interests of judicial efficiency, conservation of scarce judicial resources, and orderly and prompt administration of  justice." (citations and internal quotation marks omitted); Manlove v. Tansy, 981 F.2d 473, 476 n.4 (10th Cir. 1992) ("A court can raise the state procedural bar defense sua sponte, but is not required to do so.  We choose not to raise the issue sua sponte because of the late stage of the proceedings." (citation omitted)).

same time the applicant, or the State, must file any brief to be submitted.

    . . . . Failure to file a petition in error, with or without a brief, within the time provided, shall bar this Court from considering the appeal.

Id. at 333 (quoting Okla. Stat. Ann. tit. 22 ch. 77, sec. V, Rule 5.2(C) of the Oklahoma Court of Criminal Appeals).

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991); see also Smith v. Murray, 477 U.S. 527 (1986) (applying the procedural default rule in a death penalty case).

A state court finding of procedural default is independent if it is separate and distinct from federal law. See Ake v. Oklahoma, 470 U.S. 68, 75 (1985). In this case, the procedural bar was an "independent" state ground because "it was the exclusive basis for the state court's holding." Maes v. Thomas, 46 F.3d 979, 985 (10th Cir. 1995).

A state court finding of procedural default is adequate if it is "strictly or regularly followed" and applied "evenhandedly to all similar claims." Hathorn v.

Lovorn, 457 U.S. 255, 263 (1982). In other words, a state procedural bar "must have been 'firmly established and regularly followed' by the time as of which it is to be applied." Ford v. Georgia, 498 U.S. 411, 424 (1991).

After reviewing the relevant case law, we have found no other case in which a petitioner seeking to appeal the denial of post-conviction relief has failed to file a Petition in Error and the district court's order denying relief. Thus, such a procedural bar is not "firmly established" in a technical sense under Oklahoma case law. Nevertheless, Rule 5.2(C) clearly requires compliance with such procedures. The need for an appellate court "to determine in what way the district court addressed [a defendant's or petitioner's] claims below, or if those claims were addressed at all," Duvall, 871 P.2d at 1388, is firmly established in the procedures for appellate review, see, e.g., Yingst v. State, 480 P.2d 276, 277 (Okla. Crim. App. 1971). A copy of the district court's order filed with the reviewing court is necessary for proper evaluation of the judgment below. Thus, we also conclude that the state court's procedural rule was "adequate."

Because Mr. Duvall has defaulted his federal claims in state court under an adequate and independent state procedural rule, habeas review of the petitioner's federal claim is barred unless he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." Hoxsie v.

Kerby, 108 F.3d 1239, 1243 (10th Cir. 1997). We conclude that Mr. Duvall failed to demonstrate, or even argue, either cause and prejudice for his procedural default or that failure to consider his claim will result in a fundamental miscarriage of justice. Accordingly, we hold that Mr. Duvall is not entitled to relief on this ground because his claim is barred.

Even if we were to conclude that Mr. Duvall is not barred from raising this claim, Mr. Duvall would still not be entitled to habeas relief on the merits of the claim. The Due Process Clause mandates that a defendant receive adequate notice that he could receive the death penalty. See Lankford v. Idaho, 500 U.S. 110, 127 (1991). Similarly, a defendant must have a meaningful opportunity to deny or explain the State's evidence used to procure a death sentence. See Gardner v. Florida, 430 U.S. 349, 362 (1977).

We find nothing in the record to suggest that the state denied Mr. Duvall due process in this case. The Bill of Particulars In Rem Punishment advised Mr. Duvall that the State was seeking the death penalty because the "murder was especially heinous, atrocious or cruel." The State later gave Mr. Duvall a written list of all the witnesses the State intended to use at trial. At a pretrial hearing, Mr. Duvall asked the State to specifically endorse all of the witnesses that the State intended to call during the penalty phase of the trial. The district attorney indicated that the State would not present any witnesses during the penalty phase

whose identity was not already disclosed to the defense.  The State would call only witnesses who had testified during the guilt phase of the trial.  Tr. at 40-43.

Mr. Duvall was not denied a meaningful opportunity to explain or rebut the State's evidence because his own confession contained much of the evidence in support of the "especially heinous, atrocious or cruel" aggravator.  In addition, before trial the State identified all of the witnesses upon whom it would (and did) rely in the guilt and penalty phases of the trial.  In short, the record indicates that "[t]he problem of trial by ambush did not arise in this case." Long v. State, 883 P.2d 167, 172 (Okla. Crim. App. 1994).  Thus, Mr. Duvall was not denied due process of law and is not entitled to habeas relief on this ground.

**CONCLUSION**

"Review of a death sentence is among the most serious examinations any court of law ever undertakes." Brecheen, 41 F.3d at 1370.  After giving serious and exhaustive consideration to each of Mr. Duvall's claims, we conclude that his trial suffered from no constitutional error.  Accordingly, we AFFIRM the district court's denial of Mr. Duvall's habeas corpus petition.  In a related appeal, Duvall v. Reynolds, No. 97-6299 (10th Cir. filed Aug. 7, 1997), Mr. Duvall appeals from the district court's denial of his Rule 60(b)(6) Motion for Relief from Judgment

and Order entered in Petitioner's 28 U.S.C. § 2254 death penalty habeas action.

We AFFIRM the order of the district court denying that motion.