# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

ROBERT WILLIAM CLAYTON,

     Petitioner-Appellant,

v.

GARY GIBSON, Warden of the
Oklahoma State Penitentiary; DREW
EDMONDSON, Attorney General for
the State of Oklahoma,

     Respondents-Appellees.

No. 98-5154

### ORDER ON PETITION FOR REHEARING
Filed December 22, 1999

Before **BRORBY, BRISCOE,** and **MURPHY**, Circuit Judges.

This matter is before the court on appellant's Petition for Rehearing with a Suggestion for Rehearing En Banc.  We also have the appellee's response. Upon consideration, the panel grants limited rehearing, withdraws the prior panel opinion, and issues the attached revised opinion in its place.  The opinion is revised by deleting the third and fourth sentences of the last paragraph on page 13 of the November 15, 1999 slip opinion.  The rehearing petition is otherwise denied.

The Suggestion for Rehearing En Banc was circulated to all the active

judges of the court.[1]  No active judge having called for a poll, the Suggestion for Rehearing En Banc is denied.

<div style="margin-left:40%">

Entered for the Court,
Patrick Fisher, Clerk of Court

By:
    Keith Nelson
    Deputy Clerk

</div>

---

[1]     Judge Robert H. Henry is recused.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 22 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT WILLIAM CLAYTON,

Petitioner-Appellant,

v.

GARY GIBSON, Warden of the
Oklahoma State Penitentiary; DREW
EDMONDSON, Attorney General for
the State of Oklahoma,

Respondents-Appellees.

No. 98-5154

---

APPEAL FROM UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 96-CV-173-K)

---

James L. Hankins, of Hankins Law Office, Enid, Oklahoma, (Jeremy B. Lowrey,
Sheridan, Arkansas, with him on the brief) for the appellant.

Robert L. Whittaker, Assistant Attorney General of Oklahoma (W.A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for the appellees.

---

Before **BRORBY, BRISCOE,** and **MURPHY**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

Petitioner Robert William Clayton was convicted of first degree murder and was sentenced to death. He appeals the denial of his 28 U.S.C. § 2254 petition for habeas corpus. We affirm.

I.

Rhonda Timmons, the victim in this case, resided with her husband Bill Timmons at the South Glen Apartments in Tulsa, Oklahoma. On June 25, 1985, as Bill Timmons was returning home for lunch around 12:30 p.m., he noticed towels and a pillow near the back door to the apartment, where Rhonda Timmons had evidently been sunbathing. The door was unlocked and when he entered the apartment, he noticed blood "everywhere." He found his wife's dead body near the crib of the Timmons' baby. Rhonda Timmons had been stabbed twelve times in the chest, neck, side, and arms, and she sustained numerous bruises and blunt force injuries to her head and body. The baby was in the crib and was not hurt.

Clayton was a groundskeeper at the South Glen Apartments. Shortly before noon on June 25, he told the head groundskeeper he was going to rest in the tool shed during his lunch break. However, between 12 and 12:30 p.m., Clayton arrived at the home of Helen Syphurs, the mother of one of his roommates, Tony Hartsfield. Clayton's hand was injured and he was breathing heavily. He told Syphurs he injured his hand while resisting two male robbers. He took a shower, wrapped himself in a towel, and placed his clothing in a paper bag. Clayton

notified his employer by telephone that he would not be returning to work that day. Clayton shared a house with Hartsfield and Don and Sharon Reinke, who were Hartsfield's brother-in-law and sister. Syphurs drove Clayton home and Clayton repeated his story to Sharon Reinke. He stated his clothing was bloody and put the clothing in the washing machine. A blood-stained sock was later found on the floor near the washing machine and testing revealed the blood on the sock was Type AB, the same as Rhonda Timmons' blood. Clayton repeated his story to Hartsfield and to Don Reinke when they returned home. Police arrived around 3:30 p.m. and escorted Clayton to the police station for questioning. As he left the house, Clayton asked Hartsfield not to tell the police about a folding knife that Clayton routinely carried. The police found the knife in the backyard the following day. Although the blood traces on the knife were too minute for testing, an expert testified at trial that the knife could have been used to inflict Rhonda Timmons' injuries.

Clayton was advised of his *Miranda* rights at police headquarters and he twice confessed to killing Rhonda Timmons. His first confession was ruled inadmissible by a magistrate judge because tape recordings indicated Clayton did not fully understand his constitutional rights. Clayton is retarded and has an IQ of 68, placing him in the bottom two percent of the population. Clayton's second confession, which occurred after he was provided counsel but outside counsel's

presence, was admitted at trial.

A jury convicted Clayton of first degree malice aforethought murder and recommended the death sentence. Clayton was sentenced to death. His conviction and sentence were affirmed in Clayton v. State, 840 P.2d 18 (Okla. Crim. App. 1992), and his application for post-conviction relief was denied in Clayton v. State, 892 P.2d 646 (Okla. Crim. App. 1995). Clayton filed his 28 U.S.C. § 2254 petition for habeas corpus, asserting numerous claims of constitutional error. The district court denied the petition and issued a certificate of probable cause on all claims presented in the petition.

II.

Clayton's petition is not subject to the standards embodied in the Antiterrorism and Effective Death Penalty Act, which applies only to petitions filed after April 24, 1996. See Lindh v. Murphy, 521 U.S. 320 (1997). Clayton's petition was filed on March 5, 1996. We therefore review Clayton's petition under pre-Act law.

Our function in a habeas case is limited to insuring individuals are not imprisoned in violation of the Constitution. See Herrera v. Collins, 506 U.S. 390, 400 (1993). We therefore presume the historical factual findings of the jury and the state district court are correct and defer to a state's interpretation of its law. See Jackson v. Shanks, 143 F.3d 1313, 1317 (10th Cir. 1998). We review the

-4-

federal district court's factual findings for clear error and review all legal issues de novo. See id.

<div align="center">III.</div>

**Competency**

Clayton contends his due process rights were violated when his competency was retrospectively determined six years after his trial and under a burden of proof later found unconstitutional in Cooper v. Oklahoma, 517 U.S. 348 (1996).

Before trial, the state court ordered that Clayton be examined to determine if he was competent to stand trial. Although Dr. Samuel Sherman examined Clayton and found him competent, the court apparently did not hold a post-examination competency hearing as required by then-existing state law. On direct appeal, the Oklahoma Court of Criminal Appeals remanded the case and directed the court either to forward proof that a hearing had been held or to conduct a retrospective hearing if feasible. The trial court first conducted a hearing to determine if a retrospective competency hearing was feasible. Based upon the availability of evidence pertaining to Clayton's pretrial competency, the court determined a retrospective competency hearing was feasible. On September 12, 1991, a jury found that Clayton was competent at the time of his trial on March 1, 1986. On appeal, the Oklahoma Court of Criminal Appeals found there was sufficient evidence of Clayton's competency to render a retrospective hearing

meaningful.  Clayton , 840 P.2d at 25.  Clayton argues the six-year time lapse, the poor quality and lack of written records, and the sketchy memory of important witnesses precluded a fair retrospective determination of his competency at the time of trial.

Although retrospective competency hearings are disfavored, they are permissible "whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant."  Moran v. Godinez , 57 F.3d 690, 696 (9th Cir. 1994);  see Drope v. Missouri , 420 U.S. 162, 180-83 (1975). "A 'meaningful' determination is possible where the state of the record, together with such additional evidence as may be relevant and available, permits an accurate assessment of the defendant's condition at the time of the original state proceedings."  Reynolds v. Norris , 896 F.3d 796, 802 (8th Cir. 1996).  A court should consider (1) the passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with defendant before and during trial, including the trial judge, counsel for both the government and defendant, and jail officials.  See Reynolds , 86 F.3d at 802-03;  Moran , 57 F.3d at 696 .

Applying these factors, we find no constitutional error in the state court's

determination that a retrospective competency hearing was feasible. While the time gap between Clayton's trial and the competency determination is troubling, "[t]he passage of time is not an insurmountable obstacle if sufficient contemporaneous information is available." Reynolds, 86 F.3d at 803; see Bruce v. Estelle, 536 F.2d 1051, 1057 (5th Cir. 1976) (determining nine-year gap between trial and competency hearing did not alone vitiate opportunity for meaningful hearing); Barefield v. New Mexico, 434 F.2d 307, 309 (10th Cir. 1970) (finding "mere lapse of time before a competency hearing" does not invalidate findings made as a result of that hearing).

The trial court had before it Dr. Sherman's pretrial report finding Clayton competent to stand trial. Although the report was admittedly brief, it nonetheless constituted a contemporaneous medical determination. "[M]edical reports contemporaneous to the time [of trial] greatly increase the chance for an accurate retrospective evaluation of a defendant's competence." Moran, 57 F.3d at 696; see United States v. Mason, 52 F.3d 1286, 1293 (4th Cir. 1995) (finding competency determination possible where "the defendant's treating physicians have already conducted an inquiry into the defendant's competence and formed an opinion as to his competence at the time of the first phase of his trial").

In addition, numerous witnesses who interacted with Clayton before and during trial were available to testify at the competency hearing, including the trial

judge, clinical psychologists, the jail physician, and Clayton's trial counsel. [1]

Clayton does not dispute the availability of these witnesses, but counters with the feasibility hearing testimony of Dr. Robert Nicholson, a clinical psychologist with significant experience in competency evaluations. Dr. Nicholson testified that the time gap and the poor quality of the contemporaneous written records made it impossible for him to evaluate Clayton's competency at the time of trial. While Dr. Nicholson's testimony has probative value, it is not sufficient to establish that a retrospective competency hearing was not feasible, particularly given the finding of competency prior to trial and the availability of numerous witnesses who were familiar with Clayton at the time of trial. We conclude Clayton was not deprived of due process by having his competency determined retrospectively. See Walker v. Attorney General, 167 F.3d 1339, 1347 n.4 (10th Cir. 1999).

Clayton also contends the trial court employed an unconstitutional burden of proof at his competency hearing by requiring him to prove his competence by clear and convincing evidence. In Cooper, the Supreme Court ruled that use of the clear and convincing evidence standard in a competency hearing violated due process. 517 U.S. at 369. Because Cooper was decided after Clayton's direct and post-conviction appeals, he presented this issue for the first time in his federal

_____

[1] Except for the trial judge and one of the clinical psychologists, all of these individuals testified at the retrospective competency hearing.

habeas petition. [2] The federal district court denied relief on the ground that Clayton had procedurally defaulted this claim by failing to raise it on direct appeal. Although the court acknowledged Cooper was decided after Clayton's state court proceedings were final, it reasoned that under the 1995 amendments to Oklahoma's post-conviction statute this fact did not excuse Clayton's failure to challenge the evidentiary standard on direct appeal.

Generally, it is a prerequisite to habeas relief that a petitioner exhaust his remedies in state court. See 28 U.S.C. § 2254(b)(1). The exhaustion requirement is not jurisdictional, however, and may be waived by the state or avoided by the petitioner if an attempt to exhaust would be futile. See Demarest v. Price, 130 F.3d 922, 933-34 (10th Cir. 1997). Both exceptions apply here. The state has expressly waived the exhaustion requirement by conceding Clayton has "exhausted his state remedies as to this factual claim." Record, Doc. 10 at 46. In addition, the Oklahoma Court of Criminal Appeals ruled unequivocally that a Cooper claim is barred if not presented on direct appeal or submitted in a first application for post-conviction relief, even if the direct appeal and post-

---

[2] Respondent has not asserted, and we do not consider, whether Cooper is retroactively applicable to cases where the direct appeal was final before Cooper was decided. See Goeke v. Branch, 514 U.S. 115, 117 (1995) (holding court need not entertain a Teague v. Lane, 489 U.S. 288 (1988), defense if state has not raised it); Schiro v. Farley, 510 U.S. 222, 229 (1994) (indicating state can waive the Teague defense by not raising it).

conviction processes were final before Cooper was decided. See Walker v. State , 933 P.2d 327, 338-39 (Okla. Crim. App. 1997). Further presentation of the claim to the Oklahoma courts thus would be futile. See Wallace v. Cody , 951 F.2d 1170, 1171 (10th Cir. 1991).

Having deemed Clayton's claim exhausted, we next must consider if Clayton's claim is procedurally barred. [3] A claim that has been defaulted in state court on an adequate and independent state procedural ground will be considered on federal habeas review only if a petitioner can demonstrate cause and prejudice to excuse the default or establish failure to consider the merits of the claim will result in a fundamental miscarriage of justice. Rogers v. Gibson , 173 F.3d 1278, 1290 (10th Cir. 1999). To be adequate, a state's procedural rule must have been firmly established and regularly followed when the purported default occurred. Walker , 167 F.3d at 1344.

Here, the 1995 amendments to Oklahoma's post-conviction statute supplied the basis for the procedural bar finding. The amendments sharply limit a petitioner's ability to bring claims in a new post-conviction application that were not raised on direct appeal or in a prior post-conviction application, including

---

[3] A procedural default analysis is necessary because Clayton's challenge is a procedural competency claim, which is subject to waiver, rather than a substantive competency claim, which is not subject to waiver. See Rogers v. Gibson , 173 F.3d 1278, 1289 (10th Cir. 1999).

-10-

new claims based on an intervening change in law.      Id. at 1345.  We consistently

have held, when considering    Cooper  claims, that the 1995 amendments do not

constitute an "adequate" state law ground for procedural default purposes if they

did not exist at the time of the default.      See Rogers , 173 F.3d at 1290;   Walker ,

167 F.3d at 1345.  In this case, the district court ruled Clayton's default occurred

when his direct appeal became final in 1992, three years before the effective date

of the 1995 amendments.  "A defendant cannot be expected to comply with a

procedural rule that does not exist at the time, and should not be deprived of a

claim for failing to comply with a rule that only comes into being after the time

for compliance has passed."     Walker , 167 F.3d at 1345.  In these circumstances,

Clayton's procedural competency claim is not barred by his failure to raise it on

direct review or in his post-conviction application.  We therefore consider

Clayton's claim on the merits.

Clayton is entitled to relief on his procedural competency claim only if "the

state trial court ignored evidence that, viewed objectively, raised a bona fide

doubt as to [Clayton's] competency to stand trial."     Id. (citing  Drope , 420 U.S. at

180-81).  A defendant will be deemed competent to stand trial if at the time of

trial he had "sufficient present ability to consult with his lawyer with a reasonable

degree of rational understanding--and . . . a rational as well as factual

understanding of the proceedings against him."      Dusky v. United States   , 362 U.S.

402 (1960). Although not limited to these factors, a court conducting a competency inquiry should consider defendant's demeanor at trial, any evidence of irrational behavior by defendant, and perhaps most important, any prior medical opinions regarding competency. Walker, 167 F.3d at 1346. In addition, where, as here, defendant's competency was determined under an unconstitutional standard, the jury's finding of competency is not entitled to a presumption of correctness. Id. at 1345.

In arguing a bona fide doubt exists as to his competency at the time of trial, Clayton relies primarily on the competency hearing testimony of his trial counsel, Ronald Wallace, and of Dr. Nicholson. Wallace testified that before and during trial, he questioned Clayton's competency, specifically wondering if Clayton was capable of understanding the proceedings and assisting counsel. Although Wallace thought Clayton's comprehension was limited to understanding he was in an adversarial proceeding, Wallace declined to characterize his concerns as "serious." At the feasibility hearing, Dr. Nicholson, for the most part, reiterated his testimony that Clayton's competency at the time of trial could not be determined accurately given the dearth of contemporaneous records.

In contrast to the ambivalent testimony of Wallace and Dr. Nicholson is the unequivocal testimony of three doctors who either evaluated or observed Clayton at the time of trial. Dr. Goodman, who examined Clayton twice before trial,

testified that Clayton was lucid and did not have difficulty recalling events or relating an account of the crime. Although he conceded Clayton might have an underlying personality disorder, he was satisfied that Clayton's sanity would not be an issue at trial. Dr. Barnes, the jail physician, examined Clayton physically and responded to Clayton's claims of illness. He testified that Clayton had no physiological problems that would have affected his competency at trial. Dr. Sherman performed the pretrial examination of Clayton and found him to be competent. Dr. Sherman described the procedures he typically performed in a competency evaluation and testified that in 1986 he had found after evaluation that Clayton was competent. He was unwilling to rule out the possibility that Clayton had a mental disorder, but testified an individual can have a mental disorder and be competent to stand trial.

Clayton points out that Dr. Sherman conceded at the hearing he had no independent recollection of Clayton, had no records or files regarding the pretrial examination, and could not identify the bases for his conclusion. Although troubling, these problems ultimately pose issues of credibility. The evidence in the record does not raise a bona fide doubt as to Clayton's competency at the time of trial.

**Admissibility of statement**

Clayton asserts he is entitled to habeas relief because his involuntary statement to police was admitted at trial. He actually gave two statements to authorities. After he was taken to the police station and advised of his *Miranda* rights, he signed a waiver form and admitted killing Rhonda Timmons after she made unwanted sexual overtures toward him. Clayton refused to repeat his story for a tape recording without a lawyer present. Questioning ceased and a public defender was dispatched to serve as Clayton's attorney. The public defender spoke with Clayton alone and, before he left, advised Clayton to remain silent and requested that officers not reinitiate questioning in counsel's absence. Counsel left with the understanding that Clayton would be booked and returned to his cell.

In the course of filling out a booking information slip, Clayton was identified as "Randy" rather than "Robert." To resolve confusion, a police officer asked Clayton his "true name." Clayton provided his name, his date of birth, and his social security number. Clayton then indicated he "had something he wanted to get off his chest." Trial tr. at 896. The officer reminded Clayton of his counsel's advice, but Clayton repeated his desire to make a statement and he repeated his earlier story.

Clayton sought to suppress both confessions before trial. The trial court ruled the first statement was inadmissible because Clayton did not understand his rights and therefore could not voluntarily waive them. The court ruled the second

statement was admissible because Clayton voluntarily reinitiated communication.

On appeal, Clayton contends his counsel was ineffective for failing to challenge the voluntariness of his confession based on his mental capacity. We do not consider the merits of this argument. It is apparent from the record that Clayton's counsel did challenge the voluntariness of his confession by filing a motion to suppress, which the court denied.

Clayton also contends his confession was not voluntary because the officers improperly resumed questioning after he had invoked his right to counsel. This contention is without merit. Interrogation of an accused must cease once the accused invokes the right to counsel. Miranda v. Arizona, 384 U.S. 436, 474 (1966). Nonetheless, an accused may be interrogated further if, after invoking the right to counsel, he voluntarily initiates further communication with the police and waives his right to counsel. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). There is nothing in the record to indicate the questions to clarify Clayton's first name were designed, or reasonably likely, to elicit an incriminating admission from Clayton. Questioning related to booking or other administrative pretrial matters does not constitute "interrogation" for purposes of *Miranda*. See Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990). "Routine booking questions do not constitute interrogation because they do not normally elicit incriminating responses." United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993). It was

Clayton who reinitiated communication.   See United States v. Glover  , 104 F.3d 1570, 1581 (10th Cir. 1997).

The act of reinitiating communication does not, by itself, suffice to constitute a waiver of Clayton's right to counsel.  Instead, we must separately determine if the statement was the "product of a free and deliberate choice rather than intimidation, coercion, or deception, and . . . was made in full awareness of the nature of the right being waived and the consequences of waiving."   Cooks v. Ward, 165 F.3d 1283, 1288 (10th Cir. 1998).  In making this determination, we consider the totality of the circumstances and bear in mind "the necessary fact that the accused, not the police, reopened the dialogue."   Oregon v. Bradshaw  , 462 U.S. 1039, 1046 (1983).

Clayton's waiver clearly was effective.  There is no evidence that his change of heart was precipitated by any police impropriety or that it was prompted by any promises or inducements.  He had been advised twice of his *Miranda* rights and after his first statement had invoked the specific right he waived in making his second statement.  Detective Parke testified at Clayton's preliminary hearing that Clayton was reminded of his counsel's advice, but that Clayton nonetheless insisted upon making a statement in counsel's absence.  This evidence is more than sufficient to establish Clayton voluntarily, knowingly, and intelligently waived his right to counsel.   See Cooks, 165 F.3d at 1288-89.

-16-

**Prosecutorial misconduct**

Clayton contends prosecutorial misconduct deprived him of a fair trial. Specifically, he alleges the prosecutor (1) informed the jury the district attorney's function was to "seek the truth"; (2) improperly characterized the burden of proof; (3) purposefully aroused the passions and prejudices of the jury; (4) shaded the truth during questioning and closing argument; and (5) commented on Clayton's invocation of his rights to counsel and to remain silent.

Prosecutorial misconduct warrants federal habeas relief only if, in light of the proceedings as a whole, the conduct complained of "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986).

Two of the alleged instances of prosecutorial misconduct occurred during voir dire. First, the prosecutor asked a venire person to describe the function of the district attorney's office. When the juror responded, "Prove someone guilty," the prosecutor stated the "function of the District Attorney is to seek the truth." Trial tr. at 414-15. While this comment was improper to the extent the district attorney intended to suggest the government's allegations necessarily were true, the statement itself was a theoretically accurate description of a prosecutor's

-17-

function and not the type of egregious statement that was even remotely likely to infect the subsequent trial with unfairness. Second, the prosecutor asked a prospective juror if the juror performed his job as a safety director "reasonably well," and further, if the juror had heard the prosecutor talking about the burden of proof and understood "it is just one of reasonable doubt." Id. at 53-54. Clayton argues this colloquy informed the jury it could convict if it was "reasonably well" satisfied of defendant's guilt. Even assuming the prosecutor's statement did not accurately describe the government's burden, it had no constitutional effect on the trial. The court reminded the jury several times in instructions that the government bore the burden of proving each element of the offense beyond a reasonable doubt.

Clayton also contends that, in order to inflame the passions of the jury, the prosecutor elicited testimony that Rhonda Timmons died while looking into the crib at her baby. Notwithstanding Clayton's contentions, a review of the record reveals this was but one of several reasonable interpretations of the evidence. Clayton also complains the prosecutor elicited graphic testimony of the victim's "sucking chest wound" and testimony that "sham" resuscitation efforts were attempted because the victim's husband was outside the apartment. The testimony accurately depicted the victim's wounds and was relevant to establish the cause and manner of death. As for emergency resuscitation efforts, the witness testified

only that paramedics "at least owed it to [the victim's husband] to try, since we had no idea how long she had been down." See id. at 630. While perhaps unnecessary, these accurate statements did not render Clayton's trial fundamentally unfair. See Duvall v. Reynolds, 139 F.3d 768, 795 (10th Cir. 1998).

Clayton next contends the prosecutor misled the jury during closing argument by improperly arguing that police found Clayton's knife where Clayton said it would be instead of where Hartsfield told police it would be. Clayton *did* tell the police he thought his knife was at the house. Police found it in the yard behind the house. Clayton also complains the prosecutor questioned a detective in a manner that suggested bloody footprints were found at Clayton's house. The footprints actually were found in the apartment. Although the questioning of the detective does shift without any apparent reason from one subject to another, a reasonable juror listening to the entire testimony would have understood the detective was referring to the apartment when he described the footprints. In any event, any resulting confusion was slight and did not render the proceeding unfair.

Finally, Clayton contends the prosecutor inappropriately commented on Clayton's invocation of his right to remain silent and his right to counsel. Clayton did not present this argument in state court either on direct appeal or in

his application for post-conviction relief. It is not disputed that Oklahoma would bar consideration of this precise claim on an independent and adequate state law procedural ground if Clayton presented it in a second post-conviction application. As such, Clayton's claim is procedurally barred in the absence of a showing of cause and prejudice, an excuse Clayton does not allege. [4] See Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991); Steele v. Young, 11 F.3d 1518, 1524 (10th Cir. 1993).

### *Brady* **Claim**

---

[4] Clayton misunderstands our rules regarding exhaustion and procedural bar. He reasons (1) he did not present his claim on direct appeal or in his application for post-conviction relief; (2) Oklahoma's consistently applied procedural rules would preclude him from presenting the claim in a successive application for post-conviction relief because it previously could have been raised; and (3) because further filings in state court would be futile, the "futility" exception to exhaustion applies and mandates his new claim be heard on federal habeas review. Assuming the futility exception applies, it does not foreclose application of the procedural bar, provided (1) Clayton had the opportunity to present the issue in state court, but either chose not to or overlooked the issue entirely, and (2) the state court would bar presentation of the issue on a state procedural ground if presented in a new post-conviction application. See O'Sullivan v. Boerckel, 119 S. Ct. 1728, 1734 (1999). Because these conditions are met, the procedural bar applies.

In any event, Clayton's contention is without merit. Testimony that Clayton was advised of his rights is admissible to "lay a proper foundation for the admission of any statements" later made by Clayton. United States v. De La Luz Gallegos, 738 F.2d 378, 381 (10th Cir. 1984). "This is so because it is the jury which must ultimately make the determination as to whether or not any subsequent statements made by a defendant were voluntary and what weight to give to such statements in their deliberations." Id. at 381-82.

-20-

Clayton next argues the prosecutor failed to disclose exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963). Clayton is procedurally barred from pursuing this claim for federal habeas review. He did not present this argument in state court, either on direct appeal or in his application for post-conviction relief. It is not disputed that Oklahoma would bar consideration of this precise claim on an independent and adequate state law procedural ground if Clayton presented it in a second post-conviction application. Again, Clayton does not assert cause and prejudice in an effort to overcome this procedural bar.

*Ake* **claim**

Clayton argues the State deprived him of due process by denying his request for expert psychiatric assistance at the penalty phase of his trial.[5] Before trial, Clayton's counsel filed a motion for appointment of a private psychiatrist. Counsel stated that, based on conversations with various family members, he questioned defendant's sanity at the time of the alleged crime. After arguments, the court found the defendant failed to demonstrate that his sanity at the time of the offense was a significant factor at trial, as required by Ake v. Oklahoma, 470

---

[5] Several times in his appellate brief, Clayton also refers to the denial of expert psychiatric assistance during the guilt phase of trial. To the extent these general references are intended to constitute a separate appellate issue, they are inadequate to show Clayton's sanity was likely to be an issue during the guilt phase. See Liles v. Saffle, 945 F.2d 333, 335-36 (10th Cir. 1991).

U.S. 68 (1985).

In Ake, the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Id. at 74. To demonstrate a denial of due process under Ake at the penalty phase, a petitioner must establish both that the state presented evidence in the sentencing phase that petitioner posed a continuing threat to society and that petitioner's mental condition was likely to be a significant mitigating factor. Rogers, 173 F.3d at 1285.

Clayton presented this issue for the first time in his post-conviction application. The Oklahoma Court of Criminal Appeals ruled he had waived the issue by failing to raise it on direct appeal. Because this ruling was based on an independent and adequate state law ground, we may not consider the claim on federal habeas review unless Clayton can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." See Ross v. Ward, 165 F.3d 793, 798 (10th Cir. 1999). In ultimately concluding Clayton could not establish prejudice, the federal district court ruled that Clayton sought to excuse his default by alleging ineffective assistance of appellate counsel. Although this contention, if proven, would constitute sufficient "cause" to excuse

Clayton's default, our review of the habeas petition filed in district court does not reveal such allegation. Nor may Clayton's appellate brief fairly be read as asserting such claim. Clayton does assert, in conjunction with his _Ake_ claim, that trial counsel was constitutionally deficient in failing to present additional mitigating evidence during the penalty phase of the trial. However, Clayton does not assert his appellate counsel was ineffective for failing to raise the _Ake_ issue on direct appeal. As such, Clayton's _Ake_ claim is procedurally barred.

Even assuming Clayton has established "cause" sufficient to excuse his procedural default, the record is barren of evidence of any prejudice. First, in addition to finding Clayton posed a continuing threat to society, the jury found the murder was "especially heinous, atrocious, or cruel." Because most, if not all, of the evidence relating to the continuing threat aggravator properly would have been admitted and considered by the jury in considering the "especially heinous, atrocious, or cruel" aggravator, the _Ake_ error, if any, would be harmless. _See Rogers_, 173 F.3d at 1286; _Johnson v. Gibson_, 169 F.3d 1239, 1246 (10th Cir. 1999). Second, Clayton _did_ present testimony concerning his mental condition during the penalty phase. Dr. Diane Williamson, a psychologist who examined Clayton before trial, testified that his IQ was 68. She stated his performance on a "word recognition, spelling and arithmetic skills" test placed him at a third or fourth grade level, and other tests indicated that his "reality skills" were poor.

She further testified that he was "very limited in his abilities to maintain interpersonal relationships," was emotionally immature, was very dependent on others, and had difficulty controlling his impulses and tendencies. Trial tr. at 1051. In short, the tests revealed themes of violence, helplessness, and an inability both to solve problems and to engage in "literal, concrete modes of thinking." Id. at 1053.

Clayton acknowledges this testimony but argues at least one juror would have voted for life rather than death had a mental health expert been made available to the defense. He does not explain what testimony another mental health expert could have offered and how that testimony would have differed from the testimony that was presented. Dr. Williamson's testimony constituted powerful mitigating evidence based on Clayton's mental condition. Given the strength of this evidence, and the jury's decision to impose the death sentence, Clayton cannot establish that the additional testimony of a mental health expert appointed pursuant to Ake would have persuaded at least one juror to vote for life instead of death.

**"Especially heinous, atrocious or cruel" aggravating circumstance**

Clayton next asserts his death sentence must be vacated because the "especially heinous, atrocious or cruel" aggravating circumstance found by the

jury was supported only by "bogus" expert testimony that was erroneously admitted at trial. Clayton challenges the testimony of Kenneth Ede, a forensic chemist who at the time of trial worked part-time for the police department. At trial, he was qualified as an expert in serology. Ede testified that the blood on the sock found near the washing machine was Type AB, a type different than Clayton's but the same as that of the victim. He further testified that pubic hairs recovered from the same sock were consistent with pubic hairs taken from Clayton. Finally, he testified that, based on the nature of the blood splatters at the scene, the victim was assaulted two or three times in two or three different locations in the apartment. The prosecution used his blood splatter testimony primarily as support for its second stage argument that the murder was "especially heinous, atrocious, or cruel."

In his application for post-conviction relief, Clayton challenged Ede's qualifications to testify as a blood splatter expert. Clayton filed affidavits from law enforcement officials and agencies indicating Ede had overstated his "blood splatter" qualifications and disavowing Ede as a "blood splatter" expert. The Oklahoma Court of Criminal Appeals agreed and ruled Ede's testimony should not have been admitted. The court nonetheless found the error harmless because the testimony of the state medical examiner and the physical evidence of a "blood trail" through the apartment supported the jury's finding. The federal district

court agreed. On appeal, Clayton argues there is no evidence outside of Ede's testimony from which a rational jury could find the presence of the "especially heinous, atrocious, or cruel" aggravator beyond a reasonable doubt.

The "especially heinous, atrocious or cruel" aggravating circumstance is properly found if the death was preceded by torture or serious physical abuse, "as evidenced by conscious physical suffering." Duvall, 139 F.3d at 793. Here, the state medical examiner testified that the victim suffered blows to her head and numerous stab wounds to her chest and neck; that neither the stab wounds nor the blunt force injuries, all of which occurred before death, were sufficient to cause death instantaneously; and that wounds inflicted to the victim's neck before death were caused by a ligature of some sort, most likely her bikini top.

Notwithstanding the nature of these injuries, there is a question as to whether the victim endured "conscious physical suffering." The state medical examiner testified the stab wounds, while not likely to cause immediate unconsciousness, would cause unconsciousness within a very short time. However, the blunt force injuries to the head would almost certainly "produce unconsciousness immediately." Trial tr. at 886. The examiner was unable to ascertain which blows occurred first, the stab wounds or the head injuries.

Clayton argues no rational jury could find from this testimony that the victim was conscious after the first blow was struck. However, he ignores crucial

evidence in the record that is contrary to his position. As depicted by photographs of the scene and by numerous witnesses, there was a trail of blood from the door of the apartment to the bedroom where the victim's body was found. This trail of blood strongly suggests the victim was struck at the door to the apartment and that she retreated to the bedroom while she was conscious and under continual attack. Expert testimony is not required for a jury to conclude from this evidence that the victim was alive and conscious when many of her wounds were inflicted. There was sufficient evidence from which a rational jury could find beyond a reasonable doubt that the victim's death was preceded by serious physical abuse as evidenced by conscious physical suffering. Application of the "especially heinous, atrocious or cruel" aggravating circumstance therefore was constitutional. See Cooks, 165 F.3d at 1290.

**Ineffective assistance of counsel**

Clayton contends he was deprived of effective assistance of counsel at both phases of his trial. To demonstrate constitutionally ineffective assistance of counsel, Clayton must establish both that his counsel's representation was objectively deficient and that absent such deficiency there is a reasonable probability the result at trial would have been different. See Strickland v. Washington, 466 U.S. 668, 688, 694 (1984). Our scrutiny of counsel's

performance is highly deferential and we indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Id. at 689. Counsel's conduct is analyzed not through the distorting lens of hindsight, but from counsel's perspective at the time of the alleged error. Id.

*Guilt phase* -- It appears the gravamen of Clayton's claim is that his trial counsel was ineffective for not utilizing an alternative perpetrator defense strategy in which Hartsfield or Bill Timmons is portrayed as the killer. Clayton bolsters this broad allegation with complaints of other, more direct instances of ineffective assistance. He notes his counsel reserved and ultimately waived opening statement, failed to conduct relevant cross-examination, failed to present a case-in-chief, and made too short a closing argument.

Wallace specifically determined after preparing for trial "there was not any way to present a defense that denied Mr. Clayton's involvement in Rhonda Timmons' death, and that we simply had very little evidence to fight back with about the issue of guilt." Appendix at 3. Consequently, the primary defense chosen (the state's failure to satisfy its burden of proof) was not asserted strongly during the guilt phase "in order to maintain credibility with the jury in the mitigation phase." Id. In light of the substantial, if not overwhelming, evidence of Clayton's guilt, we cannot characterize this strategy as unreasonable. See

-28-

Hatch v. Oklahoma, 58 F.3d 1447, 1459 (10th Cir. 1995) ("For counsel's advice to rise to the level of constitutional ineffectiveness, the decision . . . must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.").

Further, there is not a shred of credible evidence, either direct or circumstantial, linking Hartsfield or Bill Timmons to the murder. In fact, Clayton mentions Bill Timmons almost as an afterthought. As for Hartsfield, Clayton attempts to reconstruct by irrational inferences, innuendos, and half-truths a story line linking Hartsfield to the scene of the crime, the possible murder weapon, and the bloody sock found by the washing machine. Trial counsel was under no duty to investigate this unreasonable alternative perpetrator theory.

Of the more direct claims of ineffectiveness, Clayton's complaint that counsel failed to make an opening statement is the only potentially viable assertion. Indeed, there is no reasonable explanation in counsel's affidavit for his decision first to reserve opening statement and then to waive it entirely. However, we consistently have held failure to make an opening statement does not alone constitute ineffective assistance of counsel. See Stouffer v. Reynolds, 168 F.3d 1155, 1163 (10th Cir. 1999).

Even if Clayton could establish his trial counsel provided ineffective first phase assistance, the evidence of Clayton's guilt is overwhelming and precludes a

-29-

finding of prejudice. In addition to Clayton's confession, the physical and circumstantial evidence directly linked Clayton, and only Clayton, to the crime scene and the murder.

*Sentencing phase* --Clayton also contends his counsel rendered ineffective assistance during the sentencing phase by failing to adequately investigate and present potentially mitigating evidence. In support of this contention, Clayton submits the affidavits of eight family members and friends who state they would have testified on behalf of Clayton during the penalty phase. Of these eight, none were contacted by trial counsel and at least one was in the courtroom during trial. The potential witnesses would in Clayton's words have "testified that Robert Clayton had good qualities as a person, that his life had value, [and] that he had touched and affected the lives of other people in a positive way." Aplt's Br. at 94.

Trial counsel has a duty to investigate the existence of potentially mitigating evidence, even if after investigation counsel makes a tactical decision not to present some or all of any mitigating evidence discovered. Stouffer, 168 F.3d at 1167. "[A]n attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances." Brecheen v. Reynolds, 41 F.3d 1343, 1369 (10th Cir. 1994).

-30-

Even if trial counsel rendered deficient assistance by not contacting family members during the course of conducting a second stage investigation, Clayton still must show prejudice from this deficient performance. Prejudice is established at the sentencing phase if there is a reasonable probability that, absent counsel's errors, "the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Davis v. Executive Dir. of Dep't of Corrections, 100 F.3d 750, 760 (10th Cir. 1996). In assessing whether counsel's deficient performance was prejudicial, we must bear in mind the mitigating evidence introduced during the penalty phase, the aggravating circumstances actually found by the jury, and the strength of the State's case. See Boyd v. Ward, 179 F.3d 904, 915 (10th Cir. 1999).

In light of the nature of the crime and the strength of the state's case, there is not a reasonable probability that the testimony of Clayton's family and friends would have altered the outcome of the sentencing phase. This is not a case where no mitigating evidence was presented on behalf of Clayton. Dr. Williamson testified at length in the sentencing phase regarding Clayton's low IQ and mental health. In addition, the jury found the presence of both the "continuing threat to society" and the "especially heinous, atrocious or cruel" aggravating circumstances. As regards the "especially heinous, atrocious or cruel" aggravator,

-31-

the testimony that family and friends considered Clayton to be a good person and that his life had value would not have explained or justified the manner in which Clayton committed the crime. By his own admission, Clayton inflicted blunt force injuries to the victim's head and body, stabbing her twelve times and choking her with her bikini top, all while she fled from the door of the apartment to the bedroom of her baby, where she collapsed and died. The nature of the victim's death reveals Clayton subjected her not to a single violent episode but a sustained assault that left a trail of blood through the apartment. During the guilt phase, the state introduced even more evidence of Clayton's violent tendencies and checkered past. It was established he had brutally assaulted and raped a woman at knife point in Alabama in 1984 and, along with Hartsfield and Hartsfield's sister, had assaulted a man in Houston shortly before the victim in the present case was murdered.

In short, while we are troubled that in preparing for the second phase of trial Clayton's counsel did not contact Clayton's immediate family, we are firmly convinced Clayton suffered no prejudice from counsel's performance. The state's case was formidable and the evidence amply supported the imposition of both aggravating circumstances. The general and cumulative mitigating testimony of Clayton's family and friends would not have made a difference. Cf. Cooks, 165 F.3d at 1296.

**Newly discovered evidence**

Clayton lists in his appellate brief several revelations discovered by his habeas counsel in interviews with trial witnesses ten years after his conviction. It is unclear whether Clayton is presenting this allegedly "newly discovered evidence" as an independent constitutional claim of actual innocence warranting habeas relief as a mechanism by which to bypass a procedural bar, or as evidence supporting his claim of ineffective assistance of counsel. Neither argument previously was presented in state court.

Clayton characterizes the following as newly discovered evidence: (1) Hartsfield confided to his sister that he may have killed a man in Texas; (2) Hartsfield's brother-in-law now denied being with Hartsfield on the morning of the murder; and (3) Hartsfield's sister contradicted her trial testimony by stating the blood on Clayton's clothing was dry when she saw it, that she witnessed Clayton hide the knife, that Hartsfield asked her to "cover" for him, and that she believed her husband was at work on the morning of the murder and not with Hartsfield. Clayton offers an affidavit from an attorney attesting to what Hartsfield's brother-in-law said in an interview but does not offer an affidavit from the brother-in-law. The transcript of a recorded conversation indicated that Hartsfield's sister could not fully recall if her husband was at work on the morning of the murder and she did not understand Hartsfield's request to "cover

him" to be a request to lie on his behalf. She also stated unambiguously that Clayton's clothing was bloody. Bearing in mind the actual state of the record, we turn to Clayton's newly discovered evidence claim.

In Herrera , the Supreme Court intimated strongly that newly discovered evidence of actual innocence is not sufficient to warrant habeas relief absent an independent constitutional violation in the underlying state criminal proceeding. 506 U.S. at 400. The Court nonetheless declined to completely foreclose the possibility that a "truly persuasive demonstration of 'actual innocence' made after trial [would] . . . warrant federal habeas relief," instead cautioning that "the threshold showing for such an assumed right would necessarily be extraordinarily high." Id. at 417. Typically, however, newly discovered evidence of actual innocence may serve only to satisfy the fundamental miscarriage of justice exception that excuses a petitioner's procedural default and permits a court to address an otherwise barred constitutional claim. Id. at 404.

Clayton's newly discovered evidence claim does not satisfy the extraordinarily high threshold set forth in Herrera and he asserts no separate underlying constitutional violation. The evidence which he asserts as newly discovered evidence barely aids his case and is merely impeaching evidence that would not cause a rational person to doubt Clayton's guilt. See Stafford v. Saffle , 34 F.3d 1557, 1561 (10th Cir. 1994). Nor is Clayton's newly discovered evidence

-34-

sufficient to invoke the fundamental miscarriage of justice exception, which excuses a petitioner's procedural default. Clayton has not made a colorable showing of factual innocence,    see Herrera , 506 U.S. at 404, and has not identified an independent constitutional claim, other than ineffective assistance of counsel, that we could review even if we found the miscarriage of justice exception applicable. As for his vague and passing reference to ineffective assistance of counsel, Clayton fails to identify how his counsel was ineffective in failing to discover this evidence or how any deficient performance prejudiced him. It is a virtual certainty that disclosure of this newly discovered evidence would not have altered the outcome of Clayton's trial.

**Cumulative error**

Clayton contends the cumulative effect of otherwise harmless errors deprived him of a fair trial. This contention does not merit review given the lack of any discernible constitutional error.

AFFIRMED.